**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
            *Plaintiff-Appellee,*

v.

HERIBERTO PEREA-REY,
            *Defendant-Appellant.*

No. 10-50632

D.C. No.
3:10-cr-01707-
LAB-1

OPINION

Appeal from the United States District Court
for the Southern District of California
Larry A. Burns, District Judge, Presiding

Argued and Submitted
October 13, 2011—Pasadena, California

Filed May 31, 2012

Before: Alfred T. Goodwin and Kim McLane Wardlaw,
Circuit Judges, and William K. Sessions III,
District Judge.*

Opinion by Judge Wardlaw

---

*The Honorable William K. Sessions III, District Judge, United States
District Court for Vermont, sitting by designation.

## COUNSEL

Gregory T. Murphy, Federal Defenders of San Diego, Inc., San Diego, California, for the defendant-appellant.

Laura E. Duffy, United States Attorney, Bruce R. Castetter and Christopher P. Tenorio, Assistant United States Attorneys, San Diego, California for the plaintiff-appellee.

## OPINION

WARDLAW, Circuit Judge:

Border Patrol agents watched a man climb over the Mexico-United States border fence and followed him as he took a taxi to Heriberto Perea-Rey's home. An agent watched the suspected undocumented alien walk through the gated entrance to the home and knock on the front door. The agent followed him through the front yard, around the side of the house and into the carport. He found the suspect there, standing with Perea-Rey in front of a side door entrance to the home, and detained both men until other agents arrived. Perea-Rey refused to allow the agents to enter his house. Forgetting for a moment that the Fourth Amendment ordinarily requires that the government obtain a warrant before it conducts a search or seizure, particularly of persons in their homes, the agents, pointing their guns at the home, ordered everyone outside. The individuals who emerged were later found to be undocumented aliens.

Indicted for harboring the aliens in violation of 8 U.S.C. § 1324, Perea-Rey moved to suppress evidence of the aliens as the fruit of a warrantless search and seizure. Though the district court found that the agents entered the curtilage of Perea-Rey's home and that there were no exigent circumstances that might justify the failure to obtain a warrant, the court denied the motion. Perea-Rey entered a conditional guilty plea and filed this appeal. Because the agents physically occupied the curtilage of Perea-Rey's home without obtaining a warrant, and no exceptions to the warrant requirement otherwise justified the search or seizure, we reverse Perea-Rey's conviction and remand.

## I.  BACKGROUND

On April 19, 2010, border patrol agents observed an individual—later identified as Pedro Garcia—enter the United

States by climbing over the United States-Mexico border fence. Eventually, Garcia traveled by taxi to Perea-Rey's home at 257 Hernandez Street, Calexico, California. Border Patrol Agent Angel Trujillo followed the taxi to Perea-Rey's residence. Hernandez Street runs east-west through a residential area more than a mile, as the crow flies, from the international border.[1]

Agent Trujillo approached Perea-Rey's home from the west on Hernandez Street. Parking his car to the west of the house, Trujillo saw Garcia leave the taxi, enter the front yard through one of two gates (the larger gate in front of the carport was closed), and knock on the front door. Perea-Rey opened the door, spoke to Garcia, and gestured towards the carport on the east side of the house.[2] From his vantage point to the west of the house, Agent Trujillo could not see into the carport. Garcia walked along the front of the house, around the corner and into the carport. Agent Trujillo followed him past the front door and into the carport, where he confronted Perea-Rey and Garcia, identifying himself as a border patrol agent. In response to Perea-Rey's question as to what was "going on," Agent Trujillo instructed him and Garcia to stay where they were until other agents arrived. Agent Trujillo held Perea-Rey and Garcia for roughly five minutes in the carport, without explaining his presence or asking whether Perea-Rey was willing to speak with him. When the agents arrived, they arrested and removed Garcia from the property and surrounded the home.

---

[1]We take judicial notice of a Google map and satellite image as a "source[ ] whose accuracy cannot reasonably be questioned," at least for the purpose of determining the general location of the home. Fed. R. Evid. 201(b). *See also Citizens for Peace in Space v. City of Colorado Springs*, 477 F.3d 1212, 1219 n.2 (10th Cir. 2007) (taking judicial notice of online distance calculations); *cf. Boyce Motor Lines v. United States*, 342 U.S. 337, 344 (1952) ("We may, of course, take judicial notice of geography.") (Jackson, J., dissenting).

[2]We attach as an Appendix four photographs of Perea-Rey's home introduced as Exhibits 1 to 4 during the suppression hearing.

Perea-Rey did not consent to the agents' request to enter the house. From within the carport, Agent Trujillo knocked on the side door, identified himself as a border patrol agent and commanded everyone to come out of the house. Four men emerged. The agents pointed guns at the home and again ordered everyone out; two more men emerged. Questioning the men, the agents determined that they were undocumented aliens, and that there was another person in the home. The agents searched the home and discovered a seventh alien.

On May 5, 2010, Perea-Rey was indicted on three counts of harboring undocumented aliens under 8 U.S.C. § 1324. He moved to suppress the evidence of the aliens gathered at his residence. After two evidentiary hearings, the district court found that the carport was within the curtilage of Perea-Rey's home, but that there was no reasonable expectation of privacy because it could be observed from the sidewalk. It therefore held that Agent Trujillo did not violate Perea-Rey's Fourth Amendment rights by entering the carport, knocking on the side door and ordering people in the house to come out. The court denied the motion to suppress as to the first four aliens who emerged in response to Agent Trujillo's command. The court granted the motion to suppress evidence and observations from within the home, including the last alien to emerge, concluding that this evidence resulted from an unconstitutional warrantless entry of Perea-Rey's home. Perea-Rey entered a conditional guilty plea to one count of the indictment. This appeal ensued.[3]

## II. DISCUSSION

"We review de novo the denial of a motion to suppress. Whether the exclusionary rule applies to a given case is reviewed de novo, while the underlying factual findings are

___

[3]The court reserved ruling on the admissibility of evidence of the two aliens who emerged after agents pointed guns at the home. Because Perea-Rey thereafter pleaded guilty, the court never decided that issue.

reviewed for clear error." *United States v. Crawford*, 372 F.3d 1048, 1053 (9th Cir. 2004) (en banc) (citations omitted). Evidence that is derived directly or indirectly from an illegal search cannot "constitute proof against the victim of the search." *Wong Sun v. United States*, 371 U.S. 471, 484 (1963).

Where the government "physically occupie[s] private property for the purpose of obtaining information," that is a " 'search' within the meaning of the Fourth Amendment." *United States v. Jones*, 132 S. Ct. 945, 949 (2012). "[S]earches and seizures inside a home without a warrant are presumptively unreasonable." *Payton v. New York*, 445 U.S. 573, 586 (1980). Because the curtilage is part of the home, searches and seizures in the curtilage without a warrant are also presumptively unreasonable. *See Oliver v. United States*, 466 U.S. 170, 180 (1984).[4] "[T]he determination that a particular search did (or did not) occur within the curtilage must be reviewed de novo on appeal." *United States v. Johnson*, 256 F.3d 895, 913 (9th Cir. 2001) (en banc).

## A.   Curtilage

[1] The district court found that the carport, which the border patrol agents occupied, was part of the curtilage of Perea-Rey's home, and we agree. We examine four non-exhaustive factors to determine whether an area is part of a home's curtilage: "the proximity of the area claimed to be curtilage to the home, whether the area is included within an enclosure surrounding the home, the nature of the uses to which the area is put, and the steps taken by the resident to protect the area from observation by people passing by." *United States v.*

---

[4]That officers believe that a suspect or instrumentality of a crime may be in a residence does not change the calculus. *See Agnello v. United States*, 269 U.S. 20, 33 (1925) ("Belief, however well founded, that an article sought is concealed in a dwelling house, furnishes no justification for a search of that place without a warrant.").

*Dunn*, 480 U.S. 294, 307 (1987); *see United States v. Struckman*, 603 F.3d 731, 739 (9th Cir. 2010) (applying *Dunn* factors). "These factors do not yield a definite answer; rather they guide [us] in determining whether the area is so intimately connected to the home that it should fall under the umbrella of the Fourth Amendment's protections." *Johnson*, 256 F.3d at 911. Our analysis of the *Dunn* factors is aided by the photographs of Perea-Rey's home introduced at the suppression hearing. Agent Trujillo testified that these photographs accurately show Perea-Rey's home and that the lighting at the time of the April 19 arrests was "roughly about the same."

**[2]** The carport more than satisfies the proximity factor. It is directly adjacent to and shares a common facade and wall with the one-story stucco home. Inside the carport there is a side door that opens directly into the home. Agent Trujillo testified that this door is set back ten to fifteen feet into the carport, but it appears from photographs to be closer to the front of the carport. The area near the side door, where Trujillo confronted Perea-Rey and Garcia, is immediately adjacent to the interior of the home.

**[3]** The carport also meets the enclosure factor; not only is it enclosed by walls and a roof, but it is further enclosed by a wrought iron fence that surrounds the property, including a small grass front yard. The fence also encloses the driveway entrance to the carport. The fence is five to ten feet from the front of the house and allows a relatively unobstructed view of the front of the home. There are two gates in the fence: a small gate in front of the main door to the house, and a larger gate across the front of the driveway. On the day of Perea-Rey's arrest, the driveway gate was closed, blocking passersby from entering the driveway and carport.

**[4]** Perea-Rey also used the carport to store valuable personal belongings. The carport enclosed, among other things, Perea-Rey's 1989 GMC pickup truck, his valuable classic

1970 GMC pickup truck, a rolling chest of automotive tools, a hand truck and building supplies. The back end of the carport opens into the private, fenced-in rear yard of the home; thus it was also protected from observation by passers-by.

**[5]** Perea-Rey went to some measure to protect the carport from observation from beyond the fence line. A solid roof and two walls shield the darkened interior from view. Examining the photographs, the district judge concluded that the area was so dark that he could not see the side door at all. While the fence does not fully obscure the carport, its interior is only readily observed from a position inside the fence line.

**[6]** Because each of the *Dunn* factors is satisfied, we agree with the district court that the agents searched the curtilage of Perea-Rey's home when they entered the carport. The carport is an area so closely connected to his home that it "fall[s] under the same umbrella of the Fourth Amendment's protections," as his home. *Johnson*, 256 F.3d at 911.

## B.   Fourth Amendment Protection

**[7]** Warrantless trespasses by the government into the home or its curtilage are Fourth Amendment searches. *Jones*, 132. S. Ct. at 950 n.3 ("Where, as here, the Government obtains information by physically intruding on a constitutionally protected area, such a search has undoubtedly occurred"). The scope of those constitutionally protected areas is rooted in the protection of private property rights. *See id.* at 949. Thus, as Justice Scalia wrote in *Jones*, "our Fourth Amendment jurisprudence was tied to common-law trespass until at least the latter half of the 20th century." *Id.* (citing *Kyllo v. United States*, 533 U.S. 27, 31 (2001)). In *Katz v. United States*, 389 U.S. 347, 351 (1967), the Court extended the protection against searches and seizures to places outside the home where a person had a "reasonable expectation of privacy." *Jones*, 132 S. Ct. at 950. In the intervening years, this holding in *Katz* has created some confusion about the interac-

tion between the reasonable expectation of privacy standard and "the traditional pre-*Katz* interpretation of the Fourth Amendment." 1 Wayne R. LaFave, *Search & Seizure* § 2.3(d) (4th ed.) (collecting and discussing cases).

**[8]** This confusion has persisted for decades. For example, in *United States v. Magana*, 512 F.2d 1169 (9th Cir. 1975), we stated that " 'a reasonable expectation of privacy,' and not common-law property distinctions, now controls the scope of the Fourth Amendment." *Id.* at 1170-71 (citing *Katz*). Relying on *Magana*, we repeated this error in a recent opinion that the government cited to the district court. *See United States v. Pineda-Moreno*, 591 F.3d 1212 (9th Cir. 2010), *vacated*, 132 S. Ct. 1533 (2012). In *Pineda-Moreno*, despite the government's admission that agents had, without a warrant, entered the curtilage of the defendant's home to place a mobile tracking device on his car in his driveway, our court concluded that there was no Fourth Amendment violation because Pineda-Moreno had no reasonable expectation of privacy in the curtilage. *Id.* at 1215. The Supreme Court recently and emphatically repudiated this reasoning, explaining that "as we have discussed, the *Katz* reasonable-expectation-of-privacy test has been *added to*, not *substituted for*, the common-law trespassory test." *Jones*, 132 S. Ct. at 952.

**[9]** After determining that the carport was part of the curtilage to the home, the district court erroneously concluded that the agents did not violate Perea-Rey's Fourth Amendment rights when they occupied the carport without a warrant. The Supreme Court has explained that the role of reasonable expectation analysis in evaluating the constitutionality of searches of the curtilage is only in determining the scope of the curtilage, and not the propriety of the intrusion. *See Dunn*, 480 U.S. at 300 ("[T]he extent of the curtilage is determined by factors that bear upon whether an individual reasonably may expect that the area in question should be treated as the home itself."). The district court circularly reasoned that because the agents were able to freely enter the carport,

Perea-Rey had no reasonable expectation of privacy in the carport. Yet, because it was curtilage, it was a constitutionally protected area, and the warrantless entry, search and seizure by the agents violated Perea-Rey's Fourth Amendment rights. *See Payton*, 445 U.S. at 586 ("It is a 'basic principle of Fourth Amendment law' that searches and seizures inside a home without a warrant are presumptively unreasonable."). No further showing was required of Perea-Rey.

**[10]** The district court also conflated the ability to observe inside the curtilage with the right to enter the curtilage without a warrant. Although a warrant is not required to observe readily visible items within the curtilage, and "officers [need not] shield their eyes when passing by a home on public thoroughfares," *California v. Ciraolo*, 476 U.S. 207, 213 (1986), a warrant is required to enter the home. In *Ciraolo*, the Supreme Court held that warrantless aerial observation of the curtilage of a home was not a violation of the Fourth Amendment, and that such observations could form the basis for probable cause to support a warrant to search the curtilage. *Id*. at 213-14. Only after obtaining a warrant based on the observations did officers actually enter Ciraolo's curtilage. The ability to observe part of the curtilage or the interior of a home does not authorize law enforcement, without a warrant, to then enter those areas to conduct searches or seizures. *See Struckman*, 603 F.3d at 747 ("[P]olice officers must either obtain a warrant or consent to enter before arresting a person inside a home or its curtilage *or* make a reasonable attempt to ascertain that he is actually a trespasser before making the arrest."). The agents here could observe the curtilage from the sidewalk and use those observations, as in *Ciraolo*, as the basis for a warrant application. But, the ability to see into the curtilage or the home does not, absent some other exception to the warrant requirement, authorize a warrantless entry by the government. Therefore, the district court erred by admitting the evidence simply because the officers could view the inside of the carport from the street.

### C.   Reasonableness of the Search

**[11]** Because Agent Trujillo did not have a warrant, his entry into the carport was presumptively unreasonable in violation of Perea-Rey's Fourth Amendment rights. "There are two general exceptions to the warrant requirement for home searches: exigency and emergency." *United States v. Martinez*, 406 F.3d 1160, 1164 (9th Cir. 2005). The district court did not clearly err when it found that there were no exigent circumstances justifying the search and the government does not challenge this finding on appeal.

Instead, the government invokes the so-called "knock and talk" exception to the warrant requirement to justify Agent Trujillo's incursion into the curtilage. We have held that "[l]aw enforcement officers may encroach upon the curtilage of a home for the purpose of asking questions of the occupants." *United States v. Hammett*, 236 F.3d 1054, 1059 (9th Cir. 2001). This doctrine has its origins in *Davis v. United States*, 327 F.2d 301, 305 (9th Cir. 1964). In *Davis*, plainclothes police officers visited a home simply "for the purpose of talking to Davis." *Id.* at 303. A child let them into the house, where they observed marijuana plants; this led to a further search, arrest and prosecution. *Id.* at 302. We relied on the subjective intent of the officers when they knocked on the door to conclude that the officers did not violate Davis's rights. *Id.* at 303 ("[I]t was not their intention to arrest the defendant nor to search the premises.").

Four decades later, in *Hammett*, which presented similar circumstances, we also relied on the subjective intent of the officers to conclude that they did not violate Hammett's Fourth Amendment rights. In *Hammett*, officers flew in a helicopter over a home in an isolated area of Hawaii. 236 F.3d at 1056. They observed what appeared to be marijuana plants in pots through the translucent plastic roof of the home. *Id.* The officers landed the helicopter in a nearby field and approached the home. *Id.* When their knocks on one door

were not answered, the officers circled the home and eventually observed marijuana through a gap in its walls. *Id.* at 1056-57. The police obtained a warrant to enter the home based on those observations. *Id.* at 1057. The *Hammett* court held that the initial approach to the home was a permissible "knock and talk," *id.* at 1059, and that "an officer may, in good faith, move away from the front door when seeking to contact the occupants of a residence," *id.* at 1060.

Although it has not addressed the knock and talk exception, the Supreme Court has unequivocally disallowed reliance on the good faith or subjective beliefs of officers as part of the analysis of whether they violated the Fourth Amendment. *See Kentucky v. King*, 131 S. Ct. 1849, 1859 (2011). In *King*, the Court rejected an exigent circumstances test that looked to bad faith of police officers in creating exigent circumstances, reasoning that only objective factors lend themselves to analysis under the Fourth Amendment's reasonableness standard. *Id.* ("'Our cases have repeatedly rejected' a subjective approach, asking only whether 'the circumstances viewed *objectively*, justify the action.'") (quoting *Brigham City v. Stuart*, 547 U.S. 398, 404 (2006)). "The subjective intent of the law enforcement officer is irrelevant in determining whether that officer's actions violate the Fourth Amendment." *Bond v. United States*, 529 U.S. 334, 339 n.2 (2000).

**[12]** The Supreme Court's rejection of good faith, subjective intent tests to gauge Fourth Amendment violations implicitly overrules some of the reasoning of cases like *Davis* and *Hammett*, which turned in part on the officer's subjective intent. Accordingly, we can no longer rely on the good faith belief of law enforcement officers in our analysis of whether an incursion into the curtilage for a knock and talk violates the Fourth Amendment. *See Miller v. Gammie*, 335 F.3d 889, 900 (9th Cir. 2003) (en banc) (We are "bound by the intervening higher authority and [must] reject the prior opinion of this court as having been effectively overruled"). To be clear, it remains permissible for officers to approach a home to con-

tact the inhabitants. The constitutionality of such entries into the curtilage hinges on whether the officer's actions are consistent with an attempt to initiate consensual contact with the occupants of the home.

[13] Officers conducting a knock and talk also need not approach only a specific door if there are multiple doors accessible to the public. "[T]he law does not require an officer to determine which door most closely approximates the Platonic form of 'main entrance' and then, after successfully completing this metaphysical inquiry, approach only that door. An officer [initiating] a 'knock and talk' visit may approach any part of the building . . . where uninvited visitors could be expected." *United States v. Titemore*, 335 F. Supp. 2d 502, 505-06 (D. Vt. 2004), *aff'd,* 437 F.3d 251 (2d Cir. 2006). However, once an attempt to initiate a consensual encounter with the occupants of a home fails, "the officers should end the knock and talk and change their strategy by retreating cautiously, seeking a search warrant, or conducting further surveillance." *United States v. Troop*, 514 F.3d 405, 410 (5th Cir. 2008) (holding that border patrol agents violated the Fourth Amendment when they conducted a warrantless search of the curtilage after there was no response to a knock and talk attempt) (internal quotation omitted).

[14] Here, Agent Trujillo watched Garcia approach the house from a vantage point where he was unable to see the side door entrance in the carport. Garcia knocked on the front door, which was visible to Agent Trujillo. Perea-Rey then signaled Garcia to walk around the house and into the carport area. Therefore Garcia was not a trespasser. Agent Trujillo, in contrast, did not enter the yard and knock on the front door to initiate a consensual contact with Perea-Rey. Agent Trujillo admitted at the evidentiary hearing that he was not invited into the carport, but that he simply followed Garcia onto the property, bypassing the front door and walking around the side of the house into the carport. It was not objectively reasonable as part of a knock and talk for Agent Trujillo to

bypass the front door, which he had seen Perea-Rey open in response to a knock by Garcia, and intrude into an area of the curtilage where uninvited visitors would not be expected to appear.

[15] The events that followed after Agent Trujillo entered the carport further undermine the government's argument that he merely attempted a consensual knock and talk. When Perea-Rey saw Agent Trujillo and asked him what was "going on," Trujillo did not answer, and instead instructed Perea-Rey to wait until backup arrived. Perea-Rey never had an opportunity to simply ignore a knock on the door to his home by police. *See Troop*, 514 F.3d at 410 ("It is hardly surprising that the aliens chose not to answer the door, given that Border Patrol agents were waiting to arrest them on the other side."). Agent Trujillo did not seek Perea-Rey's consent to enter the property or even to speak with him. He simply identified himself and ordered Perea-Rey not to move. We conclude that Trujillo did not engage in a consensual "knock and talk." Rather, Trujillo's initial detention of Perea-Rey was, at a bare minimum, a *Terry* stop. *See Terry v. Ohio*, 392 U.S. 1 (1968). We have held, however, that "the *Terry* exception to the warrant requirement does not apply to in-home searches and seizures." *Struckman*, 603 F.3d at 738.[5] Therefore, by

---

[5]Our statement in *United States v. Crapser*, 472 F.3d 1141, 1148 (9th Cir. 2007), that "[i]f an arrest in the doorway is allowed, certainly the lesser intrusion of a *Terry* stop in the hallway is also permissible" is not inconsistent with our holding. The *Terry* stop there occurred in a public area of a motel, and not in the curtilage of a home. *United States v. Vaneaton*, 49 F.3d 1423, 1425 (9th Cir. 1995), the case relied on by the *Crapser* court, also involved an arrest at the threshold of a motel room. Further, in both *Crapser* and *Vaneaton*, the suspects knowingly and voluntarily exposed themselves to police officers. Unlike a private yard or carport, "tenants in an apartment building [or motel] have no justified expectation of privacy as to a portion of the home which all residents and visitors must use to enter, the common yard open to the public or the parking lot open to all users of the apartment building." 1 Wayne R. LaFave, *Search & Seizure* § 2.3(f) (4th ed.) (quotations omitted). The encounter here was neither consensual nor in a public area of a motel or apartment building.

trespassing on the curtilage and detaining Perea-Rey, Agent Trujillo violated Perea-Rey's Fourth Amendment rights.

**[16]** The government relies exclusively on the knock and talk exception to excuse the warrantless entry into Perea-Rey's curtilage. An expansion of that exception to allow for *Terry* stops or searches and seizures within the curtilage is wholly inconsistent with *Oliver* and *Dunn*. At most, the knock and talk exception authorizes officers to enter the curtilage to initiate a consensual conversation with the residents of the home. If we were to construe the knock and talk exception to allow officers to meander around the curtilage and engage in warrantless detentions and seizures of residents, the exception would swallow the rule that the curtilage is the home for Fourth Amendment purposes. We hold that the warrantless incursion into the curtilage of Perea-Rey's home by border patrol agents and the resulting searches and seizures violated Perea-Rey's Fourth Amendment rights. The district court's denial of Perea-Rey's motion to suppress the fruits of Agent Trujillo's warrantless search was reversible error. *See Wong Sun*, 371 U.S. at 484.

### III.   CONCLUSION

For the foregoing reasons, we **REVERSE** the judgment and **REMAND**.

**APPENDIX**



**Exhibit 1**



**Exhibit 2**



**Exhibit 3**



**Exhibit 4**