Filed 4/10/13  P. v. Alejo CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>  Plaintiff and Respondent,<br><br>  v.<br><br>ALEX ALEJO,<br><br>  Defendant and Appellant. | H037602<br>(Monterey County<br>  Super. Ct. No. SS091635) |

Following a jury trial, Alex Alejo (appellant) was found guilty of two counts of attempted premeditated murder (Pen. Code, §§ 187, subd. (a), 644, counts one and two), shooting at an occupied motor vehicle (§ 246, count three),[1] shooting at an inhabited dwelling (§ 246, count four), two counts of assault with a firearm (§ 245, subd. (b), counts five and six), and one count of street terrorism (§ 186.22, subd. (a)).  As to counts one through six, the jury found true the allegation that appellant committed the crimes for the benefit of a criminal street gang (§ 186.22, subd. (b)(1)); and as to counts one, two, five and six, that he personally discharged a firearm within the meaning of section 12022.53, subdivision (c).

On November 2, 2011, the court sentenced appellant to 40 years to life in state prison, with a cumulative minimum eligible parole date of 30 years.  Appellant filed a notice of appeal the same day.

---

[1]     All unspecified section references are to the Penal Code.

The sole issue on appeal is whether appellant was denied the right to present a defense.  We shall affirm the judgment.

*Evidence Adduced at Trial*

On June 15, 2009, at about 3:30 p.m. Carlos and James Santoyo were driving to their home in Castroville.  Carlos was driving his Honda Civic and James was in the front passenger seat.[2]  As they drove on Highway 183 approaching Blackie Road, they saw a truck pull in front of their car; they recognized the driver as Pierre Santana.  When the truck turned on to Castro Street, Carlos saw someone hanging out of the window; this person was saying something, but Carlos could not hear what he was saying.  James testified that the passenger "popped" out of the window of the truck to gesture at them twice; in court, both James and Carlos identified appellant as this passenger.[3]  At the stop light at the intersection of Castro and Wood Street, where Carlos intended to turn left to continue home, the truck was waiting to turn right.  Appellant put his head out of the window of the truck again; James saw that he had a handgun.  James told Carlos to duck down and Carlos heard James say that appellant had a gun; Carlos heard gunshots and bullets hitting his car as he drove fast onto Wood Street.

Carlos drove to his house where his mother called the police.  However, James left before the police arrived because he was scared.  Initially, Carlos did not tell the police that James was in the car during the shooting.

Miguel Santoyo, one of James's and Carlos's brothers, was at the family home fixing his car at the time of the shooting.  He heard three or four gunshots; moments later he saw his brothers arrive.  They appeared to be scared.  Carlos and James told Miguel that they were shot at by someone in Pierre's truck.  Approximately 10 to 15 minutes

---

[2]     For ease of reading we refer to the Santoyo brothers by their first names.  No disrespect is intended.

[3]     After the incident both James and Carlos picked appellant out of photographic line-ups.  In his photograph, appellant was wearing the same green army sweater as the shooter was wearing on the day of the shooting.

earlier, Miguel had seen Pierre's truck and had seen the passenger in the truck. Miguel knew Pierre as they had gone to school together. In court, Miguel identified appellant as the passenger in the truck.[4]

Carlos's car was hit by bullets in three places, the driver's side door, the trunk and the front passenger door. It was stipulated that the casings found after the shooting were fired from the same firearm used in another shooting—which occurred on December 8, 2009, at the Santoyos' home—at a time when appellant was incarcerated on this case.

Eric,[5] who worked at a building at the intersection of Geil, Wood and Castro Streets, testified that he looked out the window of his office after the shooting and saw a champagne-colored full-size truck pull up to the stop line; he saw two people in the truck, one of which, the passenger, he "got a look at." Eric testified that the passenger "looked kind of like a pirate, like Johnny Depp." This person had medium length dark hair, a slender face and some facial hair that he thought was a "Fu Manchu." Eric acknowledged that he had been shown a photographic line-up about a week after the shooting and he was not able to identify appellant. However, approximately a month later he was able to identify appellant in another photographic line-up. In court, Eric was about 50 percent sure that the passenger was appellant.[6]

---

[4] Miguel testified that he saw only the side of appellant's face when appellant was in the truck. However, he saw him twice because the truck passed by him twice; once he saw the truck passenger when he was on the far side of the truck and the second time when the truck came back the passenger was closest to him. When shown a photographic line-up that included appellant's photograph in November 2009, Miguel wrote underneath appellant's photograph " 'this looks most like the guy,' " but he was not sure.

[5] At trial Eric was identified by his first name only.

[6] Carlos and James described the shooter in the June 15 incident as wearing a green camouflage army sweater with a hood. The hood was not up at the time of the shooting. Carlos could not see if he had any tattoos. He described the shooter as having hair that was cut to less than a quarter inch in length, as if it had been shaved with a number two clipper; he had a small moustache. James described the shooter as having a goatee and hair that was shaved short.

3

It was stipulated that on June 15, 2009, a bullet was shot through the front door of a home located on Geil Street. The home was located 512 feet from the intersection where the Santoyos' car had been shot.

Deputy Erik Schumacher, who testified as a gang expert, said that the Castroville Norteños, a criminal street gang, had about 2500 members. Their primary activities include committing murders, attempted murders, violent assaults, and transportation and sale of narcotics and firearms. Deputy Schumacher described four predicate offenses committed by Norteños; assault with a firearm committed by gang member Juan Carlos Godoy on May 2, 2008; possession of a firearm by gang member and felon Jose Hernandez on April 7, 2007; assault by means of force likely to produce great bodily injury by gang member Carolyn Huerta on October 15, 2007; and assault with a deadly weapon committed by gang member Ramon Obas on October 21, 2008. According to the deputy, based on appellant's tattoos and jail intake information, he opined that appellant is an active member of the gang.[7] Deputy Schumacher testified that the shooting in this case would benefit the Norteños by attempting to remove rival gang members[8] and by instilling fear into the neighborhood. Further, he informed the jury that guns can be collectively possessed by a gang, although in some cases the same individual will use a gun more than once. He had seen cases in which a particular gun was used up to seven times by various gang members.

---

[7] Previously, appellant had filled out numerous jail intake questionnaires describing himself as a Northerner or Norteño. He has tattoos on his hands that say "Castro" and "NSC"—an acronym for "North Side Castroville." His name and moniker of "Furball" had been mentioned in intercepted inmate communications or "kites" sent by Norteño inmates at the Monterey County Jail in 2009 and 2010.

[8] Carlos and James testified that they were not gang members. However, Carlos said that his family had been "mark[ed]" as Sureños by the police.

4

*Discussion*

*Right to Present a Defense*

Appellant contends that the trial court erroneously excluded third party culpability evidence, thereby violating his right to present a defense under the Fourteenth Amendment to the federal Constitution.

*Background*

Before trial, defense counsel moved to admit evidence that the gun used on June 15, 2009, was used in a second shooting on June 22, 2009, and in a third shooting on December 8th, 2009.[9] Defense counsel's offer of proof related to the June 22 shooting was that one week after the shooting in this case, a shooting occurred in the area of Pomber and Mead Streets in Castroville.[10] In this incident, the shooter was described as a Hispanic male, 5' 6" to 5' 7" tall, 170 pounds with short black faded hair with a widow's peak; he had a goatee, a green artichoke tattoo on his neck and tattoos on his arms. Following the June 22 shooting, two witnesses to the incident picked appellant from a photographic lineup as having been the shooter; a third witness picked appellant as the person who looked most similar to the June 22 shooter. However, later, appellant was excluded as a suspect because he is significantly taller than the suspect in this June 22 shooting and because he did not have an artichoke tattoo; witnesses to this incident later identified two other Norteño gang members, both of whom had artichoke tattoos, as the possible shooter.

---

[9] Appellant had been arrested on June 29, 2009, so he could not have been responsible for this third shooting.

[10] Appellant has asked us to take judicial notice that the intersection of Pomber and Mead is 1.2 miles from the intersection of Castro and Wood where the shooting occurred in this case. He has provided this court with a "Google map" showing the two locations. The People do not object. Accordingly, we grant appellant's request. (See *United States v. Perea–Rey* (9th Cir.2012) 680 F.3d 1179, 1182, fn. 1 [finding "Google map" to be a source whose accuracy cannot reasonably be questioned]; Evid. Code, 452, subds. (g), (h).)

5

Ultimately, the court allowed the defense to present evidence of the December 8 shooting, but not the June 22 shooting. The court found that there was no way to present the evidence related to the June 22 shooting without having a "second" trial in which appellant would have to defend against him being the shooter in the June 22 shooting. The court found the evidence "relevant," but overly time consuming.

Appellant argues that the court's exclusion of the evidence related to the June 22 shooting merely because it would have been time consuming to present denied him his right to present a defense and thereby denied him due process.

" 'As a general matter, the "[a]pplication of the ordinary rules of evidence . . . does not impermissibly infringe on a defendant's right to present a defense." [Citations.]' [Citation.]" (*People v. McNeal* (2009) 46 Cal.4th 1183, 1203.) Where the trial court does not preclude the defendant from presenting a defense but rejects some evidence concerning that defense, the error is reversible only if it has resulted in a miscarriage of justice. (*Ibid.*)

With certain statutory exceptions, all relevant evidence is admissible. (Evid. Code, § 351.) " 'Relevant evidence' means evidence . . . having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.)

To be admissible, third-party culpability evidence need not show " 'substantial proof of a probability' that the third person committed the act; it need only be capable of raising a reasonable doubt of defendant's guilt." (*People v. Hall* (1986) 41 Cal.3d 826, 833.) However, "there must be direct or circumstantial evidence linking the third person to the actual perpetration of the crime." (*Ibid*.)

"The principles of law are clear. . . . [T]he standard for admitting evidence of third party culpability [is] the same as for other exculpatory evidence: the evidence [has] to be relevant under Evidence Code section 350, and its probative value [can]not be

6

'substantially outweighed by the risk of undue delay, prejudice, or confusion' under Evidence Code section 352." (*People v. Kaurish* (1990) 52 Cal.3d 648, 685.)

In the present case, appellant submitted an offer of proof, which in essence showed that the gun used in the June 15 incident was the same gun used in the June 22 incident. As to the identity of the shooter in the June 22 incident, there was no definitive evidence of who that person was other than possibly another Norteño gang member. The proffered evidence showed that originally appellant had been identified as that person. The only disputed fact in this case was the identity of the shooter in the June 15 incident. However, the proffered evidence related to the June 22 incident, without more, does not raise a reasonable doubt about the identity of the shooter in the June 15 incident. We reject appellant's assertion that the evidence strongly suggests that the shooter in the June 22 incident could have carried out the shooting in the June 15 incident given the fact that the purported shooter in the June 22 incident was reported to have tattoos on his neck. Conspicuous by its absence in the description of the shooter in the June 15 incident is any report of the shooter having tattoos on his neck, which given the position of the vehicles during the shooting, Carlos and James should have been able to see. Both Carlos and James testified that the person that shot at them was wearing a hooded sweater, but the hood was down; both Carlos and James did not notice any tattoos on that person's neck. Carlos testified that he could see the person from the shoulders up.

Further, the fact that the same gun was used in the two different incidents is of no moment in light of the fact that guns can be used by different members of a gang. In the proffered evidence, we see no direct or circumstantial evidence linking the shooter in the June 22 incident to the actual perpetration of the crime in this case as required by *People v. Hall*, *supra*, 41 Cal.3d. at page 833.

On the other hand, what the proffered evidence does is raise a speculative inference that because appellant was misidentified as the shooter in the June 22 incident, appellant *may* have been misidentified as the shooter in this case.

7

The exclusion of weak and speculative evidence of third party culpability does not infringe on a defendant's constitutional rights. (*Holmes v. South Carolina* (2006) 547 U.S. 319, 326-327 (*Holmes*); *People v. Gonzales* (2012) 54 Cal.4th 1234, 1261.) Simply put, "the Constitution permits judges 'to exclude evidence that is "repetitive . . . , *only marginally relevant*" or poses an undue risk of "harassment, prejudice, [or] confusion of the issues." ' " (*Holmes*, *supra*, 547 U.S. at pp. 326-327, italics added.)[11] For a defendant's constitutional rights to override the application of ordinary rules of evidence, " 'the proffered evidence must have more than "slight-relevancy" to the issues presented. [Citation.] . . . [Citation.] The proffered evidence must be of some competent, substantial and significant value. [Citations.]' [Citations.]" (*People v. Tidwell* (2008) 163 Cal.App.4th 1447, 1457.) For the reasons outlined *ante*, we do not believe that the proffered evidence in this case rose to that level.

Contrary to appellant's assertions, the excluded evidence was not critical to his defense. Appellant was not prevented from challenging the eyewitness identification evidence; defense counsel vigorously cross examined both Carlos and James on what they saw regarding the shooter in the June 15 incident and in James's case the reliability of his identification of appellant in the photographic line-up that he was shown. The jury heard, through the court's own instruction, of the various ways in which eyewitness

---

[11] In *Holmes,* the high court had held that an evidentiary rule that a defendant could not introduce third party culpability evidence if the prosecution introduced forensic evidence that strongly supported a guilty verdict violated the defendant's federal constitutional rights to a fair trial and to present a defense. (*Holmes*, *supra*, at pp. 330–331.) In contrast to Evidence Code section 352 which the trial court applied in this case, the South Carolina rule specified that a "defendant may not introduce proof of third-party guilt if the prosecution has introduced forensic evidence that, if believed, strongly supports a guilty verdict." (*Id.* at p. 321.) The *Holmes* court concluded that "by evaluating the strength of only one party's evidence, no logical conclusion can be reached regarding the strength of contrary evidence offered by the other side to rebut or cast doubt." (*Id.* at p. 331.)

8

identification evidence must be questioned and evaluated.[12]  Here, evidentiary rules were used to exclude marginally relevant evidence.  On this record, appellant's argument that he was denied his right to present a defense fails.

Although the court excluded the evidence on the ground that it was too time consuming to present, we find that it was only marginally relevant and thus did not abridge appellant's right to present a defense.  " ' "No rule of decision is better or more firmly established by authority, nor one resting upon a sounder basis of reason and propriety, than that a ruling or decision, itself correct in law, will not be disturbed on appeal merely because given for the wrong reason.  If right upon any theory of law applicable to the case, it must be sustained regardless of the considerations which may have moved the trial court to its conclusion." ' "  (*People v. Zapien* (1993) 4 Cal.4th 929, 976.)

*Disposition*

The judgment is affirmed.

ELIA, J.

WE CONCUR:

RUSHING, P. J.

PREMO, J.

---

[12]      The jury was instructed with CALCRIM No. 313 on evaluating eyewitness identification testimony.