¶ 83.
ANN WALSH BRADLEY, J.
(dissenting). Facts shape the contours of our constitutional guarantees. By lowering the standard to meet the facts in this case, the lead opinion would erode the constitutional rights of us all.[1] It sets a trajectory where, bit by bit, almost unnoticed, we may awaken one day to discover *251 that the freedoms for which so many have fought and sacrificed have been severely curtailed.
f 84. Among those freedoms is the sanctity of the home and its curtilage. "It is axiomatic that the 'physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed.' " Welsh v. Wisconsin, 466 U.S. 740, 748 (1984) (citing United States v. United States Dist. Ct., 407 U.S. 297, 313 (1972)).
¶ 85. Ignoring that the State has the burden to overcome the presumption of unreasonableness that attaches to warrantless physical entries of the home, the lead opinion determines that Deputy Dorshorst's warrantless entry into Richard Weber's garage and his subsequent arrest met the constitutional standard. It posits that Dorshorst was "justified by the exigent circumstance of hot pursuit of a fleeing suspect who had committed jailable offenses." Lead op., ¶ 3.
¶ 86. I agree with both Justice Daniel Kelly and Justice Rebecca Grassl Bradley that there was no probable cause to believe that Weber committed a jailable offense. Additionally, I agree that under no reasonable view of the facts of this case was there an emergency justifying an exception to the Fourth Amendment's warrant requirement. The alleged "hot pursuit" occurred for no more than a few seconds and emanated from a routine traffic violation, a mere non-jailable civil offense.
¶ 87. The lead opinion further errs by failing to apply the proper analysis for determining whether exigent circumstances justify warrantless entry into a *252 suspect's home. Instead, it advances a per se rule that contravenes United States Supreme Court precedent.
f 88. Contrary to the lead opinion, and like a unanimous court of appeals, I conclude that the State failed to overcome the presumption of unreasonableness that attaches to a warrantless entry into a constitutionally protected area. Here, the government's warrantless, non-consensual intrusion into Weber's garage and the resulting search and seizure violated the Fourth Amendment of the United States Constitution. Accordingly, I respectfully dissent.
I
¶ 89. During the daylight hours of April 20, 2012, Deputy Dorshorst noticed that Weber's vehicle had a defective high-mounted brake lamp.[2] He also observed Weber's vehicle weave in its lane, deviating over the fog line. The State concedes that Dorshorst did not have probable cause to initiate a traffic stop based *253 upon the lane deviation, but instead asserts that he initiated the stop because of Weber's defective high-mounted brake lamp.
¶ 90. One hundred feet before Weber turned into his driveway, Deputy Dorshorst activated his emergency lights, but did not turn on the siren in his squad car. The record does not reflect any of the usual indicia of fleeing, such as an increase in speed, a furtive glance back at the deputy or running from the vehicle. Instead, the record reflects that Weber continued to drive for a few seconds, turned into his driveway and entered his attached garage.
¶ 91. The one bit of testimony the State attempted to offer regarding an indicia of fleeing was excluded as speculative. Without any foundation, Deputy Dorshorst testified that "it seemed to me that he was attempting to evade me." Defense counsel immediately objected and the circuit court agreed, concluding that the testimony was speculative.
¶ 92. Leaving his emergency lights on, Deputy Dorshorst parked his squad car in Weber's driveway. He then got out of his squad car and saw Weber walking up the steps in his attached garage leading to the house door. Dorshorst followed him.
f 93. According to Deputy Dorshorst's subsequent testimony, he "was just entering the garage" when he told Weber he needed to speak to him. Weber did not respond, but continued up the steps within his garage toward the house door. While in the garage Dorshorst "secured [Weber's] arm" as Weber was "just inside his [house's] door" at the top of the steps. Deputy Dorshorst again advised Weber that he needed to talk to him.
¶ 94. Deputy Dorshorst testified that he then told Weber that "I needed to talk to him and the reason *254 why I was stopping him was for his high mounted brake lamp." Dorshorst asked Weber "to come out to his car so that I could point out exactly the reason for the stop and which light was defective."
I 95. After Dorshorst made contact with Weber he observed that Weber had slow, slurred speech, a strong odor of intoxicants, and glassy, bloodshot eyes. During their conversation, Weber admitted that he had been drinking.
¶ 96. Deputy Dorshorst testified that had he not entered Weber's garage he "would still have attempted to make contact with him." According to Dorshorst, "I would have still attempted either way knocking on his door or I would have attempted other means. I wouldn't have—I would not have just left." It is unclear from the record whether the "other means" referred to obtaining a search warrant.
f 97. Weber was never cited for the defective high-mounted brake lamp and the bit of testimony the State attempted to offer regarding an indicia of fleeing was excluded as speculative. Nevertheless, he was charged with resisting an officer by fleeing and other offenses. Ultimately, he pleaded no contest to operating with a prohibited alcohol concentration as a 9th or subsequent offense, resisting an officer and possession of marijuana.
J—i I—I
¶ 98. As observed above, "(i)t is axiomatic that the 'physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed.' " Welsh, 466 U.S. at 748 (citing United States Dist. Ct., 407 U.S. at 313). Accordingly, it is a basic principle of Fourth Amendment law that warrantless *255 searches and seizures inside a home are "presumptively unreasonable." Id. at 749.
¶ 99. Under the Fourth Amendment, an attached garage has the same protections as the home. Florida v. Jardines, 133 S. Ct. 1409, 1414 (2013) (the curtilage of the house "enjoys protection as part of the home itself."); see also State v. Dumstrey, 2016 WI 3, ¶ 35, 366 Wis. 2d 64, 873 N.W.2d 502 (courts have consistently concluded that a single family home's attached garage constitutes curtilage). This basic premise is not disputed by the parties because the State concedes that Weber's attached garage is curtilage.
¶ 100. The State has the burden to demonstrate both probable cause and "exigent circumstances that overcome the presumption of unreasonableness that attaches to all warrantless home entries." Welch, 466 U.S. at 750.1 examine first whether the State has met its burden of demonstrating that Deputy Dorshorst had probable cause to arrest Weber for a jailable offense.
¶ 101. Probable cause exists where "the totality of the circumstances within the arresting officer's knowledge at the time of the arrest would lead a reasonable police officer to believe that the defendant probably committed a crime." State v. Koch, 175 Wis. 2d 684, 701, 499 N.W.2d 152 (1993). The totality of the circumstances that constitute probable cause to arrest "must be measured by the facts of the particular case." State v. Paszek, 50 Wis. 2d 619, 625, 184 N.W.2d 836 (1971).
¶ 102. The lead opinion concludes that "at the time he entered Weber's garage, Deputy Dorshorst had probable cause to arrest Weber for violations of Wis. Stat. §§ 346.04(2t) [resisting by fleeing] and 946.41(1) [obstructing]." Lead op., ¶ 23. Jailable offenses of *256 resisting and obstructing both require a suspect to "knowingly resist" an officer.[3] According to the lead opinion, it is reasonable to conclude that "Weber was likely feigning ignorance and thus fleeing" and that "most individuals would have responded to Deputy Dorshorst's obvious attempts to catch his attention." Lead op., ¶ 23. But this is the very type of assertion that the circuit court deemed inadmissible because it was speculative. Any assertion that Weber on that day knew he had a duty to stop and intentionally chose to comply with that obligation by pulling into his garage is likewise speculative.
¶ 103. The lead opinion is left with only one fact that is relevant to a determination of whether Deputy Dorshorst had probable cause to arrest Weber for "knowingly" resisting an officer. This is the fact that for a few seconds "Deputy Dorshorst activated his emergency lights while driving behind Weber's vehicle but Weber failed to pull over." Lead op., ¶ 23.
¶ 104. Although Weber does not dispute that Deputy Dorshorst activated his emergency lights, he does dispute whether he saw those lights in the seconds before he turned into his driveway and parked his vehicle. Thus, when Weber disputes that he "knowingly" resisted an officer, he is in fact disputing that he received a visible signal or failed to stop promptly.
*257 ¶ 105. The record reflects that Deputy Dorshorst activated his emergency lights, but he did so only a few seconds before Weber turned into his driveway and parked his vehicle. Turning on the siren in his squad car may have given credence to the lead opinion's speculation about Weber's intent, but there is no dispute that Deputy Dorshorst failed to turn it on.
f 106. Additionally, the record does not reflect any of the usual indicia of fleeing, such as an increase in speed, a furtive glance back at the deputy or running from the vehicle. The one bit of testimony the state attempted to offer regarding Weber's intent was excluded as speculative.
¶ 107. Deputy Dorshorst did not enter the garage because Weber was fleeing from the scene of two jailable offenses. Rather, he followed Weber into his garage because of a minor traffic violation. According to Deputy Dorshorst's own testimony, "the reason why I was stopping him was for his high mounted brake lamp."
¶ 108. When Weber did not respond to Deputy Dorshorst's request to talk, Dorshorst followed Weber up the stairs of his attached garage and grabbed Weber's arm as he was just inside his house door. He then told Weber "to come out to his car so that I could point out exactly the reason for the stop and which light was defective."
¶ 109. There are no additional facts in the record supporting a reason for the stop other than the defective high mounted brake lamp. Thus, the State has not met its burden of establishing that Deputy Dorshorst had probable cause to arrest Weber for a knowing violation of either Wis. Stat. §§ 346.04(2t) (resisting) or 946.41(1) (obstructing).
*258 ¶ 110. Without probable cause to arrest for resisting or obstructing an officer, the government's interest at the time Deputy Dorshorst entered Weber's home without a warrant was for a minor traffic violation. This minor offense does not justify "the chief evil" of entry into the home "against which the wording of the Fourth Amendment is directed." Welsh, 466 U.S. at 748 (citing United States Dist. Ct., 407 U.S. at 313).
III
¶ 111. The lead opinion's discussion of exigent circumstances is analytically unnecessary. There is no need to reach the issue of exigent circumstances unless as a threshold matter at least four Justices have determined that probable cause exists. Nevertheless, I address exigent circumstances to respond to the assertions of the lead opinion.
¶ 112. The State failed to meet its burden that there were exigent circumstances justifying Deputy Dorshort's warrantless intrusion into Weber's home. It bears "the heavy burden of trying to demonstrate exigent circumstances to overcome the presumption of unreasonableness" that attaches to warrantless home entries. State v. Rodriguez, 2001 WI App 206, ¶ 9, 247 Wis. 2d 734, 634 N.W.2d 844 (citing Welsh, 466 U.S. at 750).
¶ 113. Under both Wisconsin and United States Supreme Court jurisprudence, it is well-established that "[w]arrentless entry is permissible only where there is urgent need to do so, coupled with insufficient time to secure a warrant." State v. Smith, 131 Wis. 2d 220, 228, 388 N.W.2d 601 (1986) abrogated on other grounds by State v. Felix, 2012 WI 36, 339 Wis. 2d 670, 811 N.W.2d 775; see also Missouri v. McNeely, 133 S. *259 Ct. 1552, 1559 (2013) (quoting Michigan v. Tyler, 436 U.S. 499, 509 (1978) (a warrantless search is potentially reasonable only when "there is compelling need for official action and no time to secure a warrant.")). To determine whether a law enforcement officer faced an emergency that justified acting without a warrant, courts examine the "totality of circumstances." McNeely, 133 S. Ct. at 1559.
f 114. The facts here cannot support a conclusion that Deputy Dorshorst had an urgent need to act with no time to support a warrant. For example, the facts of this case stand in stark contrast to the facts in United States v. Santana, 427 U.S. 38 (1976), which the lead opinion relies upon as a seminal case on the exigent circumstance of hot pursuit.
¶ 115. In Santana, the hot pursuit occurred when undercover officers rushed to Santana's residence after being informed that she had marked bills from their investigation in her possession. Id. at 39-40. When the officers arrived, they saw Santana standing in the doorway with a brown paper bag in her hand. Id. at 40. As the officers shouted "police" and displayed their identification, Santana retreated into the vestibule of her house. Id.
f 116. As the Santana court explained, once Santana saw the police there was "a realistic expectation that any delay would result in destruction of evidence." Id. at 43. Thus, in Santana, there was both an urgent need to act and no time to secure a warrant because delay would lead to the loss of evidence in an undercover drug investigation.
¶ 117. The facts of this case could not be more different from those in Santana. Here, Deputy Dor-shorst stopped Weber for a defective high-mounted brake lamp. In Santana, the police were in pursuit of a *260 suspected drug dealer. Here, there was no evidence to destroy regardless of whether the focus of the analysis is on a defective high-mounted brake lamp or Weber's alleged flight from the police. In Santana, the police had to act immediately or evidence would be destroyed.
f 118. Any analysis of whether the State met the required showing that Deputy Dorshorst had an urgent need to act and no time to secure a warrant is completely absent from the lead opinion. Why? Because under the facts of this case it would be unable to meet the test.
¶ 119. Instead, the lead opinion shifts the analysis and contends that it would be unreasonable to expect Deputy Dorshorst to knock on Weber's front door or take the time to obtain a warrant, rather than invade his home. Lead op., ¶ 40. The lead opinion asserts that "Deputy Dorshorst would have needed to stop at Weber's driveway and let Weber flee into the residence, then call for backup, secure a perimeter around the house so that Weber did not continue his attempts to escape law enforcement, and obtain a warrant." Lead op., ¶ 40. "And then what? Would those who support this argument have Deputy Dor-shorst knock on the door?" Lead op., f 40.
¶ 120. The answer is yes, because this is both what the law requires and what Deputy Dorshorst testified he would do. According to Dorshorst's own testimony, had he not entered Weber's garage he "would still have attempted to make contact with him." He explained, "I would have still attempted either way knocking on his door or I would have attempted other means. I wouldn't have—I would not have just left." Attempting to secure a warrant would not have allowed Weber to escape arrest or conviction.
*261 ¶ 121. In essence, Deputy Dorshorst assumed the role of a magistrate. "When an officer undertakes to act as his own magistrate, he ought to be in a position to justify it by pointing to some real immediate and serious consequences if he postponed action to get a warrant." Welsh, 46 U.S. at 751 (quoting McDonald v. United States, 335 U.S. 451, 460 (1948)). That is simply not possible here, when even Deputy Dorshorst acknowledged that he could have pursued alternative routes. He testified that had he not entered the garage he would have knocked on the door or pursued some other means to make contact with Weber.
¶ 122. Under these facts, the State has failed to show that Deputy Dorshorst had no time to get a warrant and that there was an urgent need to act. Accordingly, I conclude that the State has not met its burden of demonstrating exigent circumstances sufficient to overcome the presumption of unreasonableness that attaches to warrantless home entries.
IV
¶ 123. By advancing a per se rule that hot pursuit of a fleeing suspect is always an exigent circumstance, the lead opinion contravenes United States Supreme Court precedent. A per se exception to the Fourth Amendment is contrary to the United States Supreme Court's recent decision in McNeely, 133 S. Ct. at 1558-59. In McNeely, the Supreme Court declined to adopt a rule that the dissipation of alcohol in the bloodstream presents a per se exigency that justifies an exception to the Fourth Amendment's warrant requirement for non-consensual blood testing in drunk driving cases. Id. at 1556. Declining to adopt a categorical rule for drunk driving investigations, McNeely *262 refused to "depart from a careful case-by-case assessment of exigency . . . Id. at 1561.
f 124. The lead opinion would create a per se exception while simultaneously asserting that it is doing no such thing.[4] See lead op., ¶ 43. Initially, it acknowledges and calls "legitimate" the concern "that applying the hot pursuit doctrine to uphold a warrant-less entry in a case where fleeing law enforcement was itself the violation giving rise to the pursuit will lead to the application of the hot pursuit doctrine in every case involving a fleeing suspect. . .." Lead op., f 43.
¶ 125. Then, in attempting to explain away the legitimacy of the concern, the lead opinion contends that it does not support a per se rule for four reasons: (1) the State will not always be able to establish probable cause; (2) reasonableness is measured in objective terms by examining the totality of the circumstances; (3) application of the hot pursuit doctrine is not circular because the legislature chose to make knowingly fleeing a jailable offense; and (4) a contrary holding would incentivize flight in every case involving a nonjailable offense. Id.
¶ 126. The lead opinion's first reason fails because it conflates probable cause with exigent circumstances. According to the lead opinion, it is not creating a per se rule in every case involving flight from an officer because "the State will not always be able to establish probable cause that the suspect was knowingly fleeing." Lead op., ¶ 43 (emphasis in original). However, as set forth above, the state must separately prove both probable cause to arrest and exigent circumstances in order to justify warrantless entry into *263 Weber's home. Payton v. New York, 445 U.S. 573, 587-90 (1980). Thus, the lead opinion has created a per se rule because in every case where an officer has probable cause, the act of fleeing from an officer will be considered an exigent circumstance.
¶ 127. The lead opinion's second reason fails because there is no legal support for the proposition that Dorshort's entry was reasonable under the totality of the circumstances because it was a limited intrusion. In recent years, the United States Supreme Court has reaffirmed that the Fourth Amendment embodies "a particular concern for government trespass upon the areas ('persons, houses, papers, and effects') it enumerates." United States v. Jones, 132 S. Ct. 945, 950 (2012).
¶ 128. Prior to Jones, courts employed the Katz "reasonable expectation of privacy" test in analyzing the Fourth Amendment's protections. See Katz v. United States, 389 U.S. 347, 351 (1967) (What a person "seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected."). However, Jones clarified that "the Katz reasonable-expectation-of-privacy test has been added to, not substituted for, the common-law trespassory test." Jones, 132 S. Ct. at 952.
¶ 129. Additionally, in Jardines, the Supreme Court further explained that "an officer's leave to gather information is sharply circumscribed when he steps off [public] thoroughfares and enters the Fourth Amendment's protected areas." 133 S. Ct. at 1415. Jardines acknowledged that the porch of a home is a semi-public area, but nonetheless determined that the use of a trained police dog on Jardines' porch was a search within the meaning of the Fourth Amendment. Id. at 1415-18.
*264 ¶ 130. Thus, Fourth Amendment jurisprudence emphasizing privacy over trespass is now inconsistent with Jones and Jardines.[5] In Santana, 427 U.S. at 42, on which the lead opinion relies in making its limited intrusion argument, the court determined that even though Santana was arrested in the threshold of her home, her Fourth Amendment rights were not violated because she "was not in an area where she had any expectation of privacy." Id. However, under Jones and Jardines, the reasonable expectation of privacy test may be "unnecessary to consider when the government gains evidence by physically intruding on constitutionally protected areas." Jardines, 133 S. Ct. at 1417; see also Jones, 132 S. Ct. at 951-52.
f 131. Nevertheless, the lead opinion turns a blind eye to current Fourth Amendment jurisprudence when it suggests that limited intrusions into the constitutionally protected areas are just fine. Conflating this case with community caretaker cases, the lead opinion deems the trespass here reasonable because Deputy Dorshorst did not:
• damage any property;
• open any doors or windows;
*265 • pull out any weapons;
• stay in the constitutionally protected area longer than necessary; or
• enter the house proper, but instead entered only the curtilage of the house. Lead op., ¶ 38.[6]
¶ 132. What the lead opinion misses is that we are not examining the reasonableness of the conduct once inside the constitutionally protected area, but rather whether the officer should have been in the protected area at all. The legal analysis for determining whether exigent circumstances justify warrantless entry is entirely unrelated to the reasonableness factors considered under the community caretaker doctrine.
¶ 133. The third reason the lead opinion offers is logically flawed. It asserts that the application of the hot pursuit doctrine in this case is not circular because the legislature chose to make knowingly fleeing a traffic offense jailable. Although the lead opinion is correct that the seriousness of the underlying offense is a factor in determining whether there are exigent *266 circumstances, the jailable offenses in this case emanate from the flight itself. This is circular reasoning because it departs from a case-by-case analysis and creates an exigency in every case where there is a flight, no matter how minor the underlying offense.
¶ 134. According to the lead opinion, exigent circumstances exist because Deputy Dorshorst had probable cause to arrest Weber for "two jailable offenses." Lead op., f 3. The two jailable offenses the lead opinion references here are resisting an officer and obstructing an officer. Lead op., ¶ 23. It then reasons that Deputy Dorshorst was in hot pursuit because Weber was "a fleeing suspect who had committed jailable offenses." Lead op., ¶ 3. Thus, according to the lead opinion's circular logic, the crime from which Weber was fleeing was his own flight.
¶ 135. Finally, the lead opinion's fourth reason fails because a case-by-case rule is required, even if the State wishes to discourage suspects from fleeing the police. The lead opinion is correct that police officers and the communities they protect have a compelling interest in discouraging suspects from fleeing to their homes, but that interest must be balanced with the Fourth Amendment's fundamental protections. However, as McNeely explained, the State's interests are adequately addressed under a case-by-case analysis and do not justify "the 'considerable overgeneralization' that a per se rule would reflect." 133 S. Ct. at 1561 (quoting Richards v. Wisconsin, 520 U.S. 385, 393 (1997)).
¶ 136. Ultimately, every rationale offered by the lead opinion in defense of its assertion that it has not created a per se rule is logically and legally unsound. In order to reach its conclusion, the lead opinion conflates legal doctrines, disregards controlling United States *267 Supreme Court precedent and engages in flawed circular reasoning.
¶ 137. Accordingly, for the reasons set forth above, I respectfully dissent.
f 138. I am authorized to state that Justice SHIRLEY S. ABRAHAMSON joins this dissent.

 A toxicology report (Exhibit 1) was offered and received into the record at the preliminary hearing. It provides that blood was "recovered from Richard L. Weber on April 20, 2012 at 1955 hours."
Judicial notice may be taken of matters of common knowledge, such as the time of sunset on April 20. See, e.g., State ex rel. Schilling v. Baird, 65 Wis. 2d 394, 399, 222 N.W.2d 666 (1974). On April 20, 2012, in the city of Arpin, Wood County, sunset began at 7:51 p.m and civil twilight ended at 8:21 p.m. See Sunrise Sunset Calendar, Wisconsin Locations, http://www.sunrisesunset.com/usa/Wisconsin.asp (last visited Nov. 16, 2016).
Given the intervening events that occurred from the time Dorshorst initiated the traffic stop to when he placed Weber under arrest, it is reasonable to conclude that Dorshorst initiated the traffic stop during daylight, well before Weber's blood was drawn at 7:55 p.m.

 Wis. Stat. § 346.04(2t) provides: "No operator of a vehicle, after having received a visible or audible signal to stop his or her vehicle from a traffic officer or marked police vehicle, shall knowingly resist the traffic officer by failing to stop his or her vehicle as promptly as safety reasonably permits."
Wis. Stat. § 946.41(1) provides: "... whoever knowingly resists or obstructs and officer while such officer is doing any act in an official capacity and with lawful authority is guilty of a Class A misdemeanor."

 At oral argument, the State conceded that it was seeking a bright-line rule in this case.

 In a footnote, the lead opinion attempts to distinguish this case from Jones and Jardines by emphasizing that the latter two are "search cases." Lead op., f 38 n.10. This distinction fails because a search occurred when Deputy Dor-shorst physically occupied Weber's private property for the purpose of obtaining information. See United States v. Jones, 132 S. Ct. 945, 949 (2012); see also Florida v. Jardines, 133 S. Ct. 1409, 1417 (2013) ("That the officers learned what they learned only by physically intruding on Jardines' property to gather evidence is enough to establish that a search occurred."); United States v. Perea-Ray, 680 F.3d 1179, 1185 (9th Cir. 2012) ("Warrantless trespasses by the government into the home or its curtilage are Fourth Amendment searches.").

 The lead opinion relies on community caretaker cases. See, e.g., State v. Pinkard, 2010 WI 81, 327 Wis. 2d 346, 785 N.W.2d 592; State v. Kramer, 2009 WI 14, 315 Wis. 2d 414, 759 N.W.2d 598. Yet, the legal analysis of exigent circumstances is distinct from the community caretaker doctrine. Compare Michigan v. Tyler, 436 U.S. 499, 509 (1978) ("Our decisions have recognized that a warrantless entry by criminal law enforcement officials may be legal when there is compelling need for official action and no time to secure a warrant."), with Pinkard, 327 Wis. 2d 346, ¶ 49 ("In considering the second reasonableness factor [under the community caretaker doctrine], we assess whether the time, location, the degree of overt authority and force displayed were appropriate under the circumstances.") (quotations and citation omitted).