**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
*Plaintiff-Appellee*,

v.

BRYANT KAZUYOSHI IWAI,
*Defendant-Appellant.*

No. 18-10015

D.C. No.
1:15-cr-00723-DKW

OPINION

Appeal from the United States District Court
for the District of Hawaii
Derrick Kahala Watson, District Judge, Presiding

Submitted February 14, 2019[*]
Honolulu, Hawaii

Filed July 23, 2019

Before: Richard C. Tallman, Jay S. Bybee,
and N. Randy Smith, Circuit Judges.

Opinion by Judge Tallman;
Dissent by Judge Bybee

---

[*] The panel unanimously concludes this case is suitable for decision without oral argument. *See* Fed. R. App. P. 34(a)(2).

**SUMMARY**[**]

## Criminal Law

The panel affirmed the district court's order denying a motion to suppress evidence seized following law enforcement agents' warrantless entry into defendant's condominium.

The agents secured a court order authorizing insertion of a tracking device to conduct a controlled delivery of a package of methamphetamine, but their subsequent entry into defendant's residence to secure the package was warrantless.

The panel affirmed the district court's ruling that the agents' entry was presumptively unreasonable under the Fourth Amendment but, considering the totality of the circumstances, exigent circumstances existed to justify the entry because it was reasonable to conclude that the destruction of incriminating evidence was occurring. Defendant's subsequent consent for a more thorough search was not therefore tainted by an illegal entry, and the district court did not err by denying his motion to suppress.

Dissenting, Judge Bybee wrote that the search and seizure was unreasonable in violation of the Fourth Amendment because the officers should have obtained an anticipatory warrant; the officers should have sought a warrant once defendant returned to his apartment with the package; and the officers lacked facts supporting exigent

---

[**] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

circumstances and, in any event, created the exigent circumstances when they violated the Fourth Amendment in their knock and announce at the apartment door.

## COUNSEL

Myles S. Breiner, Honolulu, Hawaii, for Defendant-Appellant.

Mark A. Inciong, Assistant United States Attorney; Kenji M. Price, United States Attorney; United States Attorney's Office, Honolulu, Hawaii; for Plaintiff-Appellee.

## OPINION

TALLMAN, Circuit Judge:

Defendant Bryant Iwai appeals the final judgment and sentence in his drug trafficking case and challenges the denial of his motion to suppress evidence. Iwai entered a conditional plea of guilty to prosecute this appeal. The charges arose from a controlled delivery of methamphetamine to his residence conducted by the United States Postal Inspection Service, Drug Enforcement Administration ("DEA") agents, and local drug task force officers (collectively "agents"). The agents secured a court order authorizing insertion of a tracking device to conduct the controlled delivery, but their subsequent entry into Iwai's condominium to secure the package was warrantless. Nevertheless, considering the totality of the circumstances, the district court ruled that exigent circumstances existed to justify the agents' entry. We affirm.

I

On August 4, 2015, the United States Postal Inspection Service in Honolulu intercepted a package from Las Vegas, Nevada, that was addressed to Iwai's condominium. After a narcotic detection dog alerted to the presence of a controlled substance in the package, a search warrant was obtained to open the box. Among other incriminating evidence, the box contained roughly six pounds of methamphetamine.

The next day, DEA agents obtained a second judicial authorization to track a controlled delivery of the package to Iwai's condominium building. Agents removed a majority of the methamphetamine and replaced it with a non-narcotic substitute, leaving behind only a small representative sample of the drug. They also placed in the package a GPS tracking device, which identified the location of the package, and contained a sensor, which would activate a rapid beeping signal on their monitoring equipment when the package was subsequently opened.

The agents learned that Iwai's residence was located in a multi-story condominium building that did not permit direct delivery of packages to a particular unit, but rather utilized a central location to which packages were delivered for its residents. Believing that they did not have the requisite probable cause that the package would actually end up in Iwai's unit, the agents did not, as they normally would have, seek an anticipatory search warrant to enter his residence in order to secure the box once the beeper was triggered. The agents testified that at this point in the investigation, they had no way of knowing whether the package would be retrieved in the central mail room and removed from the property and taken somewhere else.

At approximately 11:48 a.m. on August 5, 2015, a United States Postal Inspector posing as a mail carrier went to the condominium building, and from the lobby callbox telephoned Iwai's unit number to notify him that he had received a package. Iwai answered from his cell phone and requested that the package be left at the front desk with the manager. The Inspector complied.

When Iwai returned at approximately 12:56 p.m., the agents observed him pick up the package from the manager and bring it up the elevator and into his unit. Agents maintained surveillance outside to see what might transpire.

At 3:15 p.m., the beeper activated, signaling the package had been opened inside Iwai's unit. The agents went to Iwai's door, and knocked and announced their presence. After no initial response, Agent Richard Jones saw shadowy movements through the peephole, indicating that someone had come to the door, which had yet to open. After announcing their presence again, Agent Jones saw the figure walking away from the door. He knocked and announced again, but received no response. Agent Jones, the only agent directly in front of the door, then heard noises from inside the unit that sounded like plastic and paper rustling. He interpreted these noises to mean that Iwai was destroying evidence, which in his judgment required immediate action to prevent, and the agents forced entry at approximately 3:17 p.m.

When the agents entered, Iwai was in the kitchen area, and the package was lying on the floor in the living room. Apparently, the signaling device had malfunctioned, because the package was still unopened. While securing the residence, the agents observed in plain view on a table in the living room a gun and zip lock bags containing what appeared to be a powder resembling methamphetamine.

After securing the premises, Agent Jones asked Iwai for verbal consent to search the residence; consent was given, and a few minutes later Officer Jennifer Bugarin arrived with a consent-to-search form. Iwai was cooperative and calm, and promptly signed the consent form. After receiving Iwai's consent, in addition to seizing the weapon, "law enforcement officers searched the apartment and found approximately 14 pounds of crystal methamphetamine, more than $32,000 in United States currency, a digital scale, a ledger, and plastic bags."

Iwai moved to suppress all evidence and statements the government obtained from the controlled delivery operation, and the district court held a multi-day evidentiary hearing on the motion. The court denied Iwai's motion to suppress, holding, in relevant part, that the agents' entry was justified to prevent the imminent destruction of evidence, that the subsequent seizure of objects in plain view was lawful, and that Iwai's consent was voluntary. Following the denial of the suppression motion, Iwai entered a conditional guilty plea to conspiracy to possess and distribute methamphetamine, and possession of a firearm in furtherance of a drug trafficking crime.

II

We review de novo the denial of a motion to suppress evidence, which presents a mixed question of law and fact. *United States v. Crawford*, 372 F.3d 1048, 1053 (9th Cir. 2004) (en banc). While "[t]he ultimate issue of whether exigent circumstances justify a warrantless entry and/or search" is reviewed de novo, *United States v. Wilson*, 865 F.2d 215, 216 (9th Cir. 1989), the district court's findings of fact are reviewed for clear error. *United States v. Washington*, 490 F.3d 765, 769 (9th Cir. 2007).

### III

A warrantless search of a home is "presumptively unreasonable" because "the physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." *Payton v. New York*, 445 U.S. 573, 585–86 (1980) (quotations and citation omitted). This presumption is overcome only "when '"the exigencies of the situation" make the needs of law enforcement so compelling that [a] warrantless search is objectively reasonable under the Fourth Amendment.'" *Kentucky v. King*, 563 U.S. 452, 460 (2011) (quoting *Mincey v. Arizona*, 437 U.S. 385, 394 (1978)). Preventing the imminent destruction of evidence is one such exigency, and exists when "officers, acting on probable cause and in good faith, reasonably believe from the totality of the circumstances that [] evidence or contraband will imminently be destroyed . . . ." *United States v. Ojeda*, 276 F.3d 486, 488 (9th Cir. 2002) (per curiam) (quoting *United States v. Kunkler*, 679 F.2d 187, 191–92 (9th Cir. 1982)). Probable cause exists where, under the totality of the circumstances, there is "a fair probability or substantial chance of criminal activity." *United States v. Alaimalo*, 313 F.3d 1188, 1193 (9th Cir. 2002). "The government bears the burden of showing specific and articulable facts to justify the finding of exigent circumstances." *Ojeda*, 276 F.3d at 488.

It is undisputed here that, although the agents obtained a warrant to open the package and a second judicial authorization to insert a tracking device and alarm, they did not seek a warrant to subsequently enter Iwai's condominium to retrieve the package. Iwai contends, and the Dissent agrees, that the evidence found in his home should thus be suppressed because the agents could have, and therefore should have, obtained an anticipatory search

warrant.  *See* Dissent at 16–26.  But this disregards the Supreme Court's admonition that officers have no constitutional duty to obtain a warrant as soon as they have probable cause.  *See King*, 563 U.S. at 467.  Rather, the consequence of failing to obtain a warrant is that any entry into a residence is presumptively unreasonable without an applicable exception.  *Id.* at 459.  Thus, whether or not the agents could have obtained an anticipatory search warrant in this case is beside the point:  The relevant fact is simply that they did not, and any entry into Iwai's residence was presumptively unreasonable.  *Id.*

Because the agents did not have a warrant to enter and retrieve the package, their entry is lawful only if an exception to the warrant requirement such as exigent circumstances existed.  Considering the totality of the circumstances on the evidence presented at the hearing, the district court credited the agents' testimony and concluded that they reasonably believed that the imminent destruction of evidence existed to justify the agents' entry.  *See Ojeda*, 276 F.3d at 488.

The court's finding of exigency was based on the following key evidence adduced at the hearing: (1) six pounds of methamphetamine had been intercepted the day before in a package addressed to Iwai; (2) the multi-story condominium complex had a central mail room to which all packages had to be delivered, preventing the agents from sending the package on a sure course to Iwai's unit; (3) the agents observed Iwai take the package up to his unit; (4) the beeper thereafter signaled that the package had been opened; (5) the agents knew that drugs are easily destroyed or disposed of; (6) upon knocking on the door, Agent Jones saw a shadowy figure approach the door and then retreat; and (7) Agent Jones then heard a suspicious rustling noise from

inside, which in his experience as a highly trained narcotics investigator, indicated the destruction of evidence was occurring. The district court believed the agents were testifying truthfully. And no evidence refutes the conclusion that the agents were acting in good faith.

Considering all of these facts together, it was reasonable to conclude that the destruction of incriminating evidence was occurring. Exigency arose at the time Agent Jones heard the suspicious sounds. But to focus on the noises in isolation from all other factors, as the Dissent does, is not a proper "totality of the circumstances" analysis.[1] *See* Dissent at 32–34; *Ojeda*, 276 F.3d at 488. Agent Jones did not hear "a rustling of papers or plastic or something to that effect" in a vacuum. Six pounds of methamphetamine had been discovered the day before in the package addressed to Iwai. At those quantities, agents were clearly investigating a major drug distributor. The agent heard this noise *after* the beeper had signaled that the package had been opened, and he knew Iwai was inside.

Although the Dissent questions the significance of the noises Agent Jones heard, Dissent at 32–34, conduct meaningless "to the untrained eye of an appellate judge . . . may have an entirely different significance to an experienced narcotics officer" like Agent Jones. *United States v. Hicks*, 752 F.2d 379, 384 (9th Cir. 1985) (citing *Bernard,* 623 F.2d

---

[1] Indeed, our caselaw recognizes that even in situations where "no one event, considered in isolation, would be sufficient, the 'succession of superficially innocent events [can proceed] to the point where a prudent man could say to himself that an innocent course of conduct was substantially less likely than a criminal one.'" *United States v. Bernard*, 623 F.2d 551, 560 (9th Cir. 1979) (quoting *United States v. Patterson*, 492 F.2d 995, 997 (9th Cir. 1974)).

at 560), *overruled on other grounds by United States v. Ramirez*, 523 U.S. 65 (1998). Agent Jones believed that the noise he heard was Iwai destroying evidence, the trial court found his testimony credible, and there is no evidence in the record to suggest otherwise.[2] *See Ornelas v. United States*, 517 U.S. 690, 699 (1996) ("[A] reviewing court should take care . . . to give due weight to inferences drawn from those facts by resident judges and local law enforcement officers."); *United States v. Craighead*, 539 F.3d 1073, 1082 (9th Cir. 2008) ("Where testimony is taken, we give special deference to the district court's credibility determinations.").

This situation is distinguishable from *United States v. Mendonsa*, 989 F.2d 366 (9th Cir. 1993). In *Mendonsa*, the officers heard only generic nondescript noise and "pointed to no particular type of noise, which would indicate that the occupants were rushing . . . to destroy evidence." *Id.* at 371. Here, by contrast, Agent Jones heard a specific noise more incriminating and more suggestive of destruction of evidence than the "soft music" and general living sounds coming from Mendonsa's apartment.[3] *Id.* at 370–71. *See*

---

[2] To the extent that Iwai suggests that Agent Jones made up the noise, the district court listened to the witnesses and found Agent Jones specifically credible on that point. On this record, that factual finding was not clearly erroneous. *See Easley v. Cromartie*, 532 U.S. 234, 242 (2001) (noting that clear error requires a "definite and firm conviction that a mistake has been committed" (quoting *United States v. United States Gypsum Co.*, 333 U.S. 364, 395 (1948))); *Washington*, 490 F.3d at 769 (overturning a factual finding requires clear error).

[3] We disagree with the Dissent's assertion that these noises could not indicate destruction of evidence. *See* Dissent at 32–34. It would be reasonable to conclude that Iwai was rustling through the package to hastily grab the incriminating evidence and destroy it before the agents entered, or that the rustling noises indicated that Iwai was preparing to burn or shred evidence or other incriminating material.

*also United States v. Alfonso*, 759 F.2d 728, 742–43 (9th Cir. 1985) (holding that "a 'hurried scuffling noise' coming from the bathroom" of the defendant's hotel room could reasonably indicate imminent destruction of evidence); *United States v. Almonte-Baez*, 857 F.3d 27, 33 (1st Cir. 2017) (holding that exigency due to imminent destruction of evidence existed where "agents knocked on the front door of the apartment and identified themselves, [] heard someone inside the apartment running away from the door," and "noticed that the door was sealed shut"); *United States v. Clement*, 854 F.2d 1116, 1119–20 (8th Cir. 1988) (noting that "essential circumstances included the lack of response at the door after knocking, seeing someone approach the door, look through the peephole and retreat, [] hearing a scrambling noise," and "the gravity of the offense"). In sum, the rustling noises, along with all the other factors known to Agent Jones, were sufficient to create exigency under applicable precedent.

We do not consider whether the fact that the package was in Iwai's apartment for two hours before the beeper went off affects our exigent circumstances analysis because Iwai only challenged the district court's exigent circumstances determination on the ground that the Government should have sought an *anticipatory* warrant. We do not understand *Kentucky v. King* to be clearly irreconcilable with considering, in the totality of the exigent circumstances inquiry, whether the police acted in an objectively reasonable manner in the period preceding the exigency. *See* 563 U.S. at 462 ("[T]he answer to the question before us is that the exigent circumstances rule justifies a warrantless search *when the conduct of the police preceding the exigency is reasonable in the same sense*." (emphasis added)); *United States v. Good*, 780 F.2d 773, 775 (9th Cir. 1986).

Finally, the Dissent concludes that any exigency was created by the agents conducting an improper "knock and talk."   Dissent at 36–40.   But Iwai did not make this argument in the district court below, nor does he raise it before us now, and we need not address it. *See Padgett v. Wright*, 587 F.3d 983, 986 n.2 (9th Cir. 2009) (noting that this court need not "consider matters on appeal that are not specifically and distinctly raised in appellant's opening brief," nor "review [] issue[s] not raised below . . . ." (quoting *Int'l Union of Bricklayers & Allied Craftsman Local Union No. 20 v. Martin Jaska, Inc.*, 752 F.2d 1401, 1404 (9th Cir. 1985))).   That ends the inquiry.**[4]**

Because the agents entered lawfully under circumstances giving rise to an applicable exception to the warrant requirement, Iwai's subsequent consent to search the unit was not tainted. *See United States v. Taheri*, 648 F.2d 598, 601 (9th Cir. 1981) (concluding that "*unconstitutional* conduct [] not sufficiently attenuated" can taint consent (emphasis added)).   The evidence supports his plea of guilty.

---

**[4]** Even if we were to reach this issue, *Kentucky v. King* likely forecloses any argument that the police created the exigency here. 563 U.S. at 469–70 ("When law enforcement officers who are not armed with a warrant knock on a door, they do no more than any private citizen might do.  And whether the person who knocks on the door and requests the opportunity to speak is a police officer or a private citizen, the occupant has no obligation to open the door or to speak."); *id.* at 468 ("Police officers may have a very good reason to announce their presence loudly and to knock on the door with some force.").  Agent Jones waited an appropriate amount of time for Iwai to "put some shorts on," and also testified that had Iwai decided to completely ignore the police at the door, and no other factors triggering an exigency had occurred, he would have retreated and held his position until they obtained a search warrant, as required by caselaw. *See Florida v. Jardines*, 569 U.S. 1, 8 (2013); *United States v. Perea-Rey*, 680 F.3d 1179, 1188 (9th Cir. 2012).

IV

We conclude the record supports the trial court's decision that the agents' warrantless entry was justified by exigent circumstances, Iwai's subsequent consent for a more thorough search was not therefore tainted by an illegal entry, and the district court did not err by denying Iwai's motion to suppress.

**AFFIRMED**.

---

BYBEE, Circuit Judge, dissenting:

Bryant Iwai was in big trouble. On August 4, 2015, postal inspectors identified a suspicious package addressed to Iwai, and a narcotics detecting dog alerted on the package. That same day, a postal inspector, working with an interagency task force comprised of agents from the Drug Enforcement Agency ("DEA") and officers from the Honolulu Police Department ("HPD"), obtained a search warrant to open the package. Inside were six pounds of crystal methamphetamine, a substantial haul. The following morning, August 5, HPD officers obtained a second warrant—referred to as a "beeper tracker warrant"—to conduct a controlled delivery to Iwai's apartment in Pearl City. Officers first removed the six pounds of meth and replaced it with rock salt and one gram of meth. They also added a GPS tracking device and a credit card-sized device that would alert the officers if the box was opened. The officers dusted the contents with a black-light sensitive powder, repacked the box, and arranged for a postal inspector to deliver the box to Iwai's apartment complex in Pearl City the same day.

The task force was well prepared.  Two officers dressed in plain clothes were in the manager's office where they could watch the lobby and the complex's surveillance cameras, a surveillance team was posted outside the building, another team covered the emergency exits, and a team was posted in the stairwell near the 23rd floor—Iwai's floor.  The entire task force operation was directed by an HPD officer secreted in the stairwell of the 33rd floor.  The officers observed Iwai leave the apartment at 11:15am.  Then just before noon, the postal inspector took the box to the complex and spoke with the manager.  Because the box was too large to fit in a mail slot or a parcel locker, the postal inspector called Iwai's apartment from the lobby.  Iwai picked up the call on his cell phone, told the inspector that he was "on the road" and that his girlfriend would pick it up; after she did not, the inspector called again and offered to leave the package with the manager so that Iwai could pick it up later.  Approximately an hour later, Iwai retrieved the box, and the officers observed him take it to his apartment on the 23rd floor.  The teams waited patiently for some indication that the box had been opened.  At about 3:15 p.m.—more than three hours since they had delivered the box and two hours since Iwai had picked it up—the beeper went off, indicating that the box may have been opened.  Some seven officers on the stairwell on the 23rd floor geared up in body armor and, carrying a ballistic shield and a battering ram, went to Iwai's apartment.  The lead officer in the stairwell, DEA Agent Jones, holding the shield and a drawn weapon, knocked on the door, yelled "police," and demanded that Iwai open the door.  He kicked the door another three times and continued to demand that Iwai open the door.  At that point, Jones looked through the peephole and saw a shadow moving.  He announced several times, "Bryant, I can see you through the peephole.  Open the door."  Jones continued to knock and announce.  Finally,

Jones stopped knocking, and listening, he heard noises "like somebody going through a garbage can . . . like, a rustling of papers or plastic or something to that effect." Jones testified that he was afraid that Iwai was destroying evidence, so he ordered the officer with the ram to breach the door, and the officers spilled in. Iwai was alone inside, standing in the kitchen. The package containing the meth was in the living room, unopened.

Over the course of just two days, August 4–5, the task force had obtained two warrants—one to open the package identified by the postal inspectors and one to effect a controlled delivery with a GPS tracker and a beeper. The task force had employed at least a dozen officers at Iwai's apartment complex for nearly four hours before a team of seven officers, armed, in body armor, and carrying a ballistic shield and a battering ram, breached Iwai's apartment. Yet at no time did the officers make any effort to obtain a search warrant for Iwai's apartment. They later testified that they did not think they could obtain an anticipatory warrant because they could not be sure that Iwai would take the package from the mailroom to his apartment. They offered no explanation for why, once they knew that Iwai had retrieved the package and taken it into his apartment, they did not seek a warrant but waited in the stairwell for a beeper that might or might not go off. Once the beeper did go off— a false positive, as it turned out—the officers demanded that Iwai open his door to them, and when he chose not to and instead had the audacity to move about his apartment and "rustle" paper, they broke the door down.

The Fourth Amendment does not protect us from searches and seizures in our "persons, houses, papers, and effects." U.S. Const. amend. IV. Just from "unreasonable" ones. *Id.* This was an unreasonable search and seizure. The

officers had Iwai dead to rights.  They knew he was likely a big cog in a meth distribution operation in Honolulu.  The care with which they planned and conducted the controlled delivery and the stake out at Iwai's apartment complex is ample evidence of that.  What is inexplicable is why the officers failed to make any attempt to secure a warrant before they breached his apartment to secure the "evidence"—the one gram of meth and six pounds of rock salt the officers themselves had placed in the box.  This is too much for me. I would suppress the evidence obtained from the search.

In Part I, I address why the officers should have obtained an anticipatory warrant.  In Part II, I address why they should have sought a warrant once Iwai returned to his apartment with the package.  In Part III, in a closer question, I conclude that the officers lacked facts supporting exigent circumstances and, in any event, created the exigent circumstances when they violated the Fourth Amendment in their knock and announce.  I respectfully dissent.

I

The officers should have sought an anticipatory warrant. Anticipatory warrants are designed for this precise situation—an immediate search upon completion of a controlled delivery.  *See*, *e.g.*, *United States v. Penney*, 576 F.3d 297, 311 (6th Cir. 2009) ("[A]nticipatory search warrants are typically sought to conduct searches triggered by a police-controlled delivery of contraband . . . ."); William E. Ringel, *Searches and Seizures, Arrests and Confessions* § 4:9 (2d ed. 2019) (collecting cases where anticipatory warrants were obtained for controlled delivery); 67 A.L.R.5th 361 (same).  As the Supreme Court has explained,  "[a]n anticipatory warrant is 'a warrant based upon an affidavit showing probable cause that at some future time (but not presently) certain evidence of crime will be

located at a specified place.'" *United States v. Grubbs*, 547 U.S. 90, 94 (2006) (quoting 2 W. LaFave, *Search and Seizure* § 3.7(c) (4th ed. 2004)). In *Grubbs*, the Court upheld the constitutionality of anticipatory warrants because they are "no different in principle from ordinary warrants. They require the magistrate to determine (1) that it is *now probable* that (2) contraband, evidence of a crime, or a fugitive *will be* on the described premises (3) when the warrant is executed." *Id.* at 96. Thus, the supporting affidavit from police must show "not only that *if* the triggering condition occurs there is a fair probability that contraband or evidence of a crime will be found in a particular place, but also that there is probable cause to believe the triggering condition *will occur*." *Id.* at 96–97 (quotation marks and citation omitted); *accord United States v. Perkins*, 887 F.3d 272, 274 (6th Cir. 2018) ("Anticipatory search warrants, like all search warrants, require probable cause. . . . The triggering event provides that cause."); *United States v. Vesikuru*, 314 F.3d 1116, 1119 (9th Cir. 2002) ("The execution of an anticipatory search warrant is conditioned upon the occurrence of a triggering event.").

In a controlled delivery, the triggering event occurs when the package containing contraband is physically taken into the location specified in the warrant. *See Grubbs*, 547 U.S. at 94; *United States v. Becerra*, 97 F.3d 669, 671 (2d Cir. 1996) ("The warrant remains contingent until delivery because some uncertainty exists as to whether the suspect will give further credence to that relationship by accepting the package."). The supporting affidavit must demonstrate probable cause—a "fair probability"—to believe that the package will be taken to the specified location. *Grubbs*, 547 U.S. at 95. We have held that the affidavit must show that "the property sought is on a *sure course* to the

destination targeted for the search." *United States v. Ruddell*, 71 F.3d 331, 333 (9th Cir. 1995) (emphasis added).

Here, five officers testified at the suppression hearing that "[they] couldn't obtain an anticipatory search warrant." Well-trained, the officers each testified that they could not be certain that the package was on a "sure course" to Iwai's apartment. Their sole explanation for this belief was that "the parcel would not have been delivered to the exact unit" but rather "to the downstairs office area where residents of that place could actually come and pick up the parcels." The majority accepts this explanation, concluding that the officers had no way of knowing whether "the package would actually end up in Iwai's unit" or "whether the package would be retrieved in the central mail room and removed from the property and taken somewhere else." Maj. Op. at 4. The officers' explanation for their decision and the majority's acceptance of that rationale are inconsistent with our cases and contradicted by the officers' own actions.

## A

I am not sure what prompted the officers' impression about the "sure course" requirement, but they have badly misunderstood the anticipatory warrant cases. Accepting the government's reasoning would abrogate the need for anticipatory warrants almost entirely. As I discussed above, an anticipatory warrant cannot be executed until a triggering condition occurs, and for a controlled delivery, the triggering condition is when the package enters the place to be searched. *See Grubbs*, 547 U.S. at 94; *United States v. Ricciardelli*, 998 F.2d 8, 13 (1st Cir. 1993) ("[T]he event that triggers the search must be the delivery of the contraband *to the premises to be searched . . . .*"). At the point of delivery to the specified location—not before—there is probable cause. *See Vesikuru*, 314 F.3d at 1119 ("If the triggering

event does not occur, probable cause to search is lacking."). The fact a package may not enter a residence is precisely why an anticipatory warrant is a conditional warrant: if the condition is not satisfied, there is nothing to execute.

The purpose of the "sure course" requirement is to create a nexus between the contraband and the place to be searched. Delivering a package to a residential address creates that nexus.[1] *See*, *e.g.*, *Vesikuru*, 314 F.3d at 1122; *United States v. Dennis*, 115 F.3d 524, 530–31 (7th Cir. 1997); *United States v. Hugoboom*, 112 F.3d 1081, 1087 (10th Cir. 1997); *United States v. Wylie*, 919 F.2d 969, 974–75 (5th Cir. 1990); *United States v. Dornhofer*, 859 1195, 1198 (4th Cir. 1988); *United States v. Goodwin*, 854 F.2d 33, 35–36 (4th Cir. 1988). The cases are quite clear that placing a package containing a valid mailing address in the mail establishes probable cause—a "sure course"—to believe that the package will be found at that destination. *See Dennis*, 115 F.3d at 531 ("[W]here nothing in the record indicates that the contraband might not have been delivered to the residence to be searched, simply discovering the package in

---

[1] The surety of a package's course is further confirmed when the police are in full control of the delivery. "[A]ll types of government-controlled deliveries are more likely to reach their destinations than other types of deliveries and that, consequently, a magistrate may conduct a lesser inquiry into the sure course requirement when a request for an anticipatory warrant is based upon a government-controlled delivery." *Dennis*, 115 F.3d at 531; *United States v. Leidner*, 99 F.3d 1423, 1429 (7th Cir. 1996) ("[G]overnment-controlled deliveries may be more likely to reach their destination than those deliveries expected within the normal course of a drug organization's operations."); *United States v. Scheffer*, 463 F.2d 567, 575 (5th Cir. 1972) (finding "there [was] simply no plausible explanation as to why customs officials failed to go before a magistrate and obtain a search warrant" when the officials "actually planned the cocaine transfer and could have controlled the time at which it took place").

the mail stream and placing it back into the mail stream to effect a controlled-delivery should satisfy the sure course requirement."); *Dornhofer*, 859 F.2d at 1198 ("When [the officer] placed the contraband in the mail, the requirement . . . that the contraband was on a sure course to its destination was met."). Here, the fact that a postal inspector was delivering the package directly to Iwai's apartment complex, where all his mail was delivered, creates a nexus between the contraband and his apartment sufficient to establish probable cause, or a "fair probability," that the package would enter his residence. *Grubbs*, 547 U.S. at 95. This is a sufficient basis for seeking an anticipatory warrant, even though there is a possibility that a package won't make it onto the premises identified in the warrant. *See Ricciardelli*, 998 F.2d at 11 ("[S]o long as the requisite *probability* exists, the *possibility* that things might go awry does not forestall the issuance of a warrant."). And if, in the end, the condition does not occur, and the warrant can't be executed, the police will have to take alternative measures, but at least they will have made a good faith effort to satisfy the Fourth Amendment's warrant requirement.

The "sure course" principle comes from our decision in *United States v. Hendricks*, 743 F.2d 653, 655 (9th Cir. 1984). The police delivered a package addressed to the defendant at a post office location that required him to come pick it up. Concurrently, the police obtained an anticipatory warrant to search his home. The defendant argued that there was no probable cause to support the warrant, and we agreed. We observed that the package was never on a sure course to the defendant's house because "the agents had no information giving rise to a belief that the package would ever go to [the defendant's] home." *Id.* at 655. We explained that the defendant's "business premises were the only place that was linked to past illegal activity, the

residence not at all." *Id.* at 654. In other words, there was no *nexus* between the package and the home—only between the package and the business premises. We specifically noted that mail addressed and sent to the house, rather than a P.O. Box, would have been sufficient. *See id.* at 655 ("[U]nless the suitcase were on a sure course to the house, *for example, in the mail addressed to the home address*, no probable cause would exist to believe it would arrive there.") (emphasis added) (citations omitted); *accord United States v. Rowland*, 145 F.3d 1194, 1204–06 (10th Cir. 1998) (finding a package was not on a "sure course" to his residence when defendant was required to pick up the package at the post office); *Ricciardelli*, 998 F.2d at 12–14 (same).

We have elaborated on *Hendricks* in subsequent cases. In *United States v. Hale*, for example, the agents obtained an anticipatory warrant to seize obscene material mailed to Hale at his home. 784 F.2d 1465, 1467–68 (9th Cir. 1986), *abrogated in part on other grounds by New York v. P.J. Video, Inc.*, 475 U.S. 868, 875 (1986). The Postal Service actually delivered the envelopes to Hale "in the front yard of his home." *Id*. at 1468. We distinguished *Hale* from *Hendricks*. "In *Hendricks*, the evidence was not on a sure and irreversible course to its destination" because it was headed to the post office—without any nexus to Hendricks' home. *Id.* By contrast, in *Hale* "the evidence was in the mail addressed to Hale *for home delivery*." *Id*. at 1468–69 (emphasis added). Similarly, in *United States v. Ruddell*, the anticipatory warrant was issued for child pornography addressed to Ruddell's residence. 71 F.3d 331, 332 (9th Cir. 1995). We once again explained that the problem in *Hendricks* was that the "magistrate judge could not establish a reasonable belief that the defendant would bring the contraband to his home." *Id.* at 333. Unlike in *Hendricks*,

in *Ruddell*, "the evidence was in the control of the Postal Inspector, who had explicitly described her plans to execute a controlled delivery to [the defendant's] house in her affidavit in support of the warrant." *Id.*

We applied these principles in *United States v. Vesikuru*, a case very similar to this one. 314 F.3d at 1122–23. In *Vesikuru*, a narcotics task force, executing a search warrant, discovered PCP in a package addressed to a residence in Seattle. *Id.* at 1118. The officers arranged for a controlled delivery and obtained an anticipatory warrant to search the residence. *Id.* Vesikuru argued that the anticipatory warrant lacked probable cause. We disagreed, emphatically. The fact that the "package was addressed and en route to the West Seattle residence . . . *guaranteed* that the package was on a 'sure course' to the West Seattle residence." 314 F.3d at 1122 (emphasis added).

Here, as in *Hale*, *Ruddell*, and *Vesikuru*, Iwai's package was fully and properly addressed to him at a residence where he regularly received mail. There was no reason to believe that Iwai would not pick up the package in the usual course and take it to his apartment. This case is unlike *Hendricks*, where the officers sought to search Hendricks's house, even though the delivery was to a post office box and the officers knew that Hendricks had been conducting his illegal actions at his office, not his house.

The officers explained that they didn't think they could obtain an anticipatory warrant because they couldn't be sure that Iwai would take the package to his apartment. Of course, the officers are correct: Iwai *might* have taken the package directly to his car. He *might* have taken it to someone else's apartment. Or, he *might* have refused delivery. But the package was delivered by regular mail to an address at his apartment building. People in apartment

buildings regularly receive mail; and, like house dwellers, they often take their mail to their apartments. The fact that Iwai lived in an apartment on the 23rd floor and had to retrieve the package from the manager's office does not diminish the likelihood that Iwai would return to his apartment with the package. *See Dennis*, 115 F.3d at 527, 530–31 (upholding an anticipatory warrant for a controlled delivery to an apartment; postal inspector actually delivered the package to the defendant seated outside on the porch, who took it inside); *Dornhofer*, 859 F.2d at 1197–98 (upholding anticipatory warrant for delivery to a mail box outside of the apartment to be searched). The officers' explanation is thin gruel. When we are dealing with probable cause, we are always playing the percentages. *Grubbs*, 547 U.S. at 95 ("Because the probable-cause requirement looks to whether evidence will be found *when the search is conducted*, all warrants are, in a sense, 'anticipatory.'"). To obtain any warrant, a police affidavit must explain to a magistrate why the police have *reason to believe* that evidence of a crime will be found in a particular place. It is always a predictive judgment.

Short of sliding mail through a slot in the front door, there is no way to *ensure* that any package will cross the threshold of any particular dwelling. Place it on a porch or put it in a mailbox? Someone can pick it up and carry it off the premises. Knock on the door to hand-deliver? The addressee may refuse the package or take it directly to her car or over to the neighbor's house or even to the public library. What if a home has a very long driveway, and the owner drives down it to retrieve the mail? What if the mailboxes to homes or condos are at the entrance to a complex or subdivision? Many modern subdivisions have a group mailbox in the neighborhood with a separate parcel locker for oversized packages. Are these homes no longer

candidates for anticipatory warrants because the owner might not return home with the mail? Are the only persons eligible for an anticipatory warrant those who, for better or worse, still have a mail slot in the door?[2]

These distinctions seem utterly arbitrary. Since *Hendricks*, the issue is not whether the package will *surely enter* a residence, it is whether it is *surely headed that way*, and Iwai's package was properly and fully addressed to him, including his apartment number. Upholding the government's reasoning—that delivery to a central mailroom in an apartment complex is insufficient to establish probable cause for an anticipatory warrant— substantially reduces Fourth Amendment protection for anyone who lives in an apartment.

## B

The officers may have testified that they weren't sure where Iwai would go with the package, but we don't have to speculate as to where the task force thought Iwai would take it—their actions make it unmistakably clear: the task force put two officers in the lobby to see if Iwai went upstairs or somewhere else; it located a couple of officers outside, presumably in case he left the building on foot or in his car; and it put at least seven officers in the stairwell on the 23rd floor. The task force knew that Iwai *might* take the package somewhere else; but their actions reveal that they also knew

---

[2] In *Hale*, "[t]he packages were handed to Hale in the front yard of his home." 784 F.2d at 1468. If the magistrate had known that Hale would be in his front yard, would he still have issued an anticipatory warrant? What, other than our common experience, tells us that Hale was likely to take the packages into the house? In Hale's case, fortunately for the police, he did and the police were able to execute the warrant, but the police had no guarantee that he would do so.

it is was *most likely* that Iwai would take it to his apartment. *See United States v. Golson*, 743 F.3d 44, 54–55 (3d Cir. 2014) ("[W]hile it was possible the occupants of the residence would refuse delivery of the Parcel, or accept delivery but leave the Parcel unopened, it was more probable they would accept and open."). In sum, the officers behaved precisely as they would have if they had obtained an anticipatory warrant—they dedicated the bulk of their resources to watching his apartment, but covered themselves in case he didn't. They played the percentages. They watched Iwai take the package into his apartment, waited for the beeper to go off, then immediately sent their team to the apartment. Had they obtained an anticipatory warrant, the condition would have been triggered the moment the package crossed the threshold, and the search would have been valid.

The majority excuses the lack of a warrant by pointing out that the police are not required to obtain a warrant "as soon as they have probable cause." Maj. Op. at 8; *see Kentucky v. King*, 563 U.S. 452, 466–67 (2011). That is true but irrelevant. As the Supreme Court explained in *United States v. Watson*, "[t]here is no requirement that a search warrant be obtained the moment police have probable cause to search. The rule is . . . that present probable cause be shown and a warrant obtained *before a search is undertaken*." 423 U.S. 411, 449 (1976) (emphasis added). The fact the officers did not have to obtain a warrant the moment they had probable cause is not an excuse for failing to obtain one at all. Moreover, the consequences of the failure to obtain an anticipatory warrant are quite predictable—and those consequences benefit neither the government nor the subject of the search. As the First Circuit anticipated, "[w]ere 'anticipatory warrants' unlawful, law enforcement agents would have to wait until

the triggering event occurred; then, if time did not permit a warrant application, they would have to forego a legitimate search, or more likely, simply conduct the search (justified by 'exigent circumstances') without any warrant at all." *United States v. Gerndon*, 18 F.3d 955, 965 (1st Cir. 1994) (Breyer, J.).    Thus, the Eleventh Circuit concluded, anticipatory warrants "better serve the objective of the Fourth Amendment by allowing law enforcement agents to obtain a warrant in advance of delivery, rather than forcing them to go to the scene without a warrant and decide for themselves, subject to second-guessing by judicial authorities, whether the facts justify a search." *United States v. Santa*, 236 F.3d 662, 673 (11th Cir. 2000).

The controlled delivery here was on a sure course to Iwai's apartment, the officers knew it and acted on it, and they had probable cause—well-established in our cases—to obtain an anticipatory warrant.  They should have done so and spared us the task of second-guessing their decision.

## II

Even if the officers reasonably believed they could not obtain an anticipatory warrant, that does not excuse their failure to seek a warrant once they knew that Iwai had taken the package to his apartment.  Exigency alone is insufficient to justify the officers' warrantless entry.  Rather, to establish exigency, "the government must also show that a warrant could not have been obtained in time, . . . [and] that a telephonic warrant was unavailable or impractical." *United States v. Good*, 780 F.2d 773, 775 (9th Cir. 1986) (internal citation omitted); *cf. United States v. Young*, 909 F.2d 442, 446 (11th Cir. 1999) ("[T]he appropriate inquiry is whether the facts, as they appeared at the moment of entry, would lead a reasonable, experienced agent to believe that evidence might be destroyed *before a warrant could be secured*.")

(emphasis added) (quoting *United States v. Rivera*, 825 F.2d 152, 156 (7th Cir. 1987)). "[I]f the state had time to obtain a warrant, it stands to reason that there can be no 'exigent circumstance.'" *Kirkpatrick v. Cty. of Washoe*, 843 F.3d 784, 791 (9th Cir. 2016) (en banc).

The government made no effort to show that the task force could not have obtained a warrant in time. The officers observed Iwai take the package into his apartment at 12:50 pm. At that point, there was no debate that they had probable cause to obtain a warrant to search the apartment. There were a dozen officers on site, and the officers had already obtained two warrants in previous 24 hours—one that very morning at 9 am. Moreover, it would have been easy for the officers to prepare an application in advance (even if they didn't submit it as an anticipatory warrant), to call in if Iwai took the package into his apartment. Yet they made no effort to do so. Instead, the officers waited "around the apartment building's perimeter, inside the building manager's office, and in stairwells near ... Iwai's apartment," for four hours—and during two and a half of those, they were *absolutely certain* the drugs were inside the apartment. A warrant could have been obtained telephonically within minutes. *See Birchfield v. North Dakota*, 136 S. Ct. 2160, 2192 (2016) ("'[A]dvances' in technology . . . now permit 'the more expeditious processing of warrant applications.'") (Sotomayor, J., concurring in part and dissenting in part) (quoting *Missouri v. McNeely*, 569 U.S. 141, 154 n.4 (2013)); *Leidner*, 99 F.3d at 1425 & n.1 (explaining that a judge orally authorized search after delivery was made to the residence); *see also* Fed. R. Crim. P. 4.1 (describing the procedure for obtaining a warrant by telephone); *id.* 41(d)(3) (authorizing telephone search warrants); Haw. R. Penal P. 41(h)–(i) (allowing warrants to be obtained over the phone via an oral affidavit). But the

officers neither obtained a warrant nor provided any explanation why they failed to do so—or even attempted to. Here, a warrant was available and practical, and thus the officers cannot claim exigency. *See United States v. Alvarez*, 810 F.2d 879, 884 (9th Cir. 1987) ("The action of the agents and the Assistant United States Attorney in ignoring the telephone warrant procedure totally frustrates the accommodation approved by Congress.  It cannot be sanctioned by us.").

It was, of course, possible that Iwai might have opened the package before a warrant could be obtained, triggering the beeper.  But at that point, the officers still did not need to rush the apartment.  Iwai had no reason to suspect police presence outside his apartment.  Thinking that he had received a valuable shipment of meth, Iwai would have no reason to destroy the drugs.  *King*, 563 U.S. at 474 ("[P]ersons in possession of valuable drugs are unlikely to destroy them unless they fear discovery by the police."); *United States v. George*, 883 F.2d 1407, 1413 (9th Cir. 1989) ("Suspects who are inside their homes and unaware of their impending arrests generally have no reason [to] immediately . . . destroy the fruits of their crime . . . .  Consequently, law enforcement officers confronting this type of situation can, without great difficulty, maintain surveillance of the premises.") (citations omitted).  The officers would have had no difficulty continuing surveillance while they obtained a telephonic warrant, which can be done in as little as fifteen minutes—considering they had already been watching the apartment for four hours.  *See*, *e.g.*, *McNeely*, 569 U.S. at 173.  And, again, if the officers had any reason to believe that Iwai was about to destroy the evidence while they worked to get a warrant, they retained the option of entering under the exigent circumstances doctrine.  *See Mincey v. Arizona*, 437 U.S. 385, 394 (1978) (finding no exigent

circumstances when "[t]here was no indication that evidence would be lost, destroyed, or removed during the time required to obtain a search warrant"); *United States v. Reid*, 226 F.3d 1020, 1028 (9th Cir. 2000) ("[T]he government did not explain why the officers could not have simply staked out the apartment while waiting for a warrant."); *United States v. Impink*, 728 F.2d 1228, 1231 (9th Cir. 1984) ("Where the police have ample opportunity to obtain a warrant, we do not look kindly on their failure to do so."); *United States v. Blake*, 632 F.2d 731, 734 (9th Cir. 1980) ("[U]nder the circumstances of this case the acquisition of a warrant would not have presented any great difficulty nor would have entailed the loss of any substantial amount of time."). The officers could have continued to watch the apartment while a warrant was obtained—before or after the beeper went off—or, at least, while they made a good faith effort to obtain one. It was unreasonable for them not to seek a warrant.

### III

Finally, I have at least a nagging feeling that "[t]he agent[s'] actions in this case were . . . fundamentally inconsistent with any true exigency." *Alvarez*, 810 F.2d at 882. This is a closer issue for me, but I am deeply concerned that the officers jumped the shark when they claimed they were entitled to enter Iwai's apartment on the basis of observing furtive movements through a peephole and hearing the rustling of paper and plastic. I have two concerns: First, that the officers lacked reasonable indicia that Iwai was about destroy any evidence and, second, that any exigency here resulted from the officers' own violations of the Fourth Amendment.

A

"[P]hysical entry into the home is the 'chief evil against which the wording of the Fourth Amendment is directed.'" *Frunz v. City of Tacoma*, 468 F.3d 1141, 1142 (9th Cir. 2006) (quoting *United States v. U.S. Dist. Court for E. Dist. of Mich., S. Div.*, 407 U.S. 297, 313 (1972)). Thus, a person's home is "given the highest protection against warrantless searches." *United States v. Romero-Bustamente*, 337 F.3d 1104, 1107 (9th Cir. 2003) (citation omitted). A warrantless search is presumptively unreasonable, and "the government bears a *heavy burden* of demonstrating that exceptional circumstances justified a departure from the normal procedure of obtaining a warrant." *United States v. Driver*, 776 F.2d 807, 810 (9th Cir. 1985) (emphasis added). "[E]xceptions to the warrant requirement are 'narrow and their boundaries are rigorously guarded.'" *Sandoval v. Las Vegas Metro. Police Dep't*, 756 F.3d 1154, 1161 (9th Cir. 2014) (quoting *Hopkins v. Bonvicino*, 573 F.3d 752, 763 (9th Cir. 2009)).

1

The officers claim that their warrantless entry was justified because "acting on probable cause and in good faith, [they] reasonably believe[d] from the totality of the circumstances that . . . evidence or contraband [would] imminently be destroyed." *United States v. Ojeda*, 276 F.3d 486, 488 (9th Cir. 2002); *see Kirkpatrick*, 843 F.3d at 791; *United States v. Struckman*, 603 F.3d 731, 738 (9th Cir. 2010). The government did not provide sufficient facts to establish an objectively reasonable belief that Iwai was imminently destroying evidence. "The exigency exception permits warrantless entry where officers 'have both probable cause to believe that a crime has been or is being committed and a reasonable belief that their entry is necessary to

prevent . . . the destruction of relevant evidence.'" *Sandoval*, 756 F.3d at 1161 (citation omitted). The government must provide "specific and articulable facts" to justify the finding of exigent circumstances, *id.* (citation omitted), and we view the exigencies "from the totality of circumstances known to the officers at the time of the warrantless intrusion," *United States v. Licata*, 761 F.2d 537, 543 (9th Cir. 1985).

First, the mere fact that agents knew there was meth in Iwai's apartment is not sufficient. *See United States v. Allard*, 600 F.2d 1301, 1304 (9th Cir. 1979) ("[T]he search cannot be justified solely because an agent knows that there is contraband on the premises."); *see also Santa*, 236 F.3d at 669 ("The mere presence of contraband . . . does not give rise to exigent circumstances.") (citation omitted); *United States v. Kane*, 637 F.2d 974, 980 (3d Cir. 1981) ("[C]ourts have . . . refused to find an exception based on the 'mere presence of drugs' on the premises.") (citation omitted).

Second, the fact that the beeper went off, signaling that the package likely had been opened, does not mean that drugs would be imminently destroyed. As explained, Iwai had no knowledge of the police presence and surveillance, and thus he would have no reason to destroy valuable drugs. *See Santa*, 236 F.3d at 670 ("[The defendants], unaware of their impending arrest, had no reason . . . to destroy the valuable drugs they were trying to sell."); *United States v. Tobin*, 923 F.2d 1506, 1511 (11th Cir. 1991) ("Circumstances are not normally considered exigent where the suspects are unaware of police surveillance."); *George*, 883 F.2d at 1412–15 (collecting cases).

Third, the fact that Iwai refused to open the door does not create an exigent circumstance. "Every occupant of the home has a right—protected by the common law for

centuries and by the Fourth Amendment since 1791—to refuse entry" to police who do not have a warrant. *Georgia v. Randolph*, 547 U.S. 103, 123–24 (2006) (Stevens, J., concurring). And police must imply refusal from a resident's silence because "passive refusal to consent to a warrantless search is privileged conduct which cannot be considered as evidence of criminal wrongdoing." *United States v. Prescott*, 581 F.2d 1343, 1351 (9th Cir. 1978); *see United States v. Mendonsa*, 989 F.2d 366, 370 (9th Cir. 1993) ("A refusal to reply to an officer's order to 'open up' can be implied from silence."). Iwai's decision to assert his Fourth Amendment right to refuse entry to the officers cannot be used to justify a finding of exigent circumstances.

Fourth, the majority and the district court point to the fact that the lead agent, looking through the peephole, saw a shadowy figure approach the door and then retreat. Maj. Op. at 8. That fact only confirms what the officers knew—that Iwai was in the apartment and now likely knew they were there—but it proves nothing about the exigent nature of the circumstances. He had an absolute right not to open the door.

Fifth, and most importantly, the district court credited DEA Agent Jones's statement that he "heard noises" through the door, like "a rustling of papers or plastic." By itself, the fact is pedestrian. "Merely hearing some noise inside is not sufficient to justify forcible entry. Some noise is normal to ordinary living . . . ." *Mendonsa*, 989 F.2d at 370–71. Jones identified no sound of scrambling, running, yelling, running water, flushing, or the opening of doors or windows, as one would expect when a person rushes about to destroy evidence of a crime. *Compare United States v. Andino*, 768 F.3d 94, 99 (2d Cir. 2014) (finding exigency when the defendant "slammed shut the front door, ran from the door,

opened and closed drawers, and turned on the kitchen faucet"), *United States v. Etchin*, 614 F.3d 726, 734 (7th Cir. 2010) ("The sound of someone walking around, for example, or a voice that announces, 'The cops are here,' is not enough by itself.  But other sights and sounds—toilets flushing, a door slammed, people running, an obvious lie by the person answering the door, or efforts to remove contraband from the house—may be evidence that there is an emergency that calls for an immediate, warrantless intrusion."), *and United States v. Leveringston*, 397 F.3d 1112, 1116 (8th Cir. 2005) (finding exigency when there was "water continuing to run and a garbage disposal continuing to grind") *with United States v. Ramirez*, 676 F.3d 755, 762 n.5 (8th Cir. 2012) (finding no exigency when the defendant's reaction was not "the verbal, visual, or aural equivalent of, 'The police are here, destroy the drugs'").  While we certainly give weight to the opinion of experienced narcotics officers, even we know that you cannot destroy drugs by rustling papers, no matter how quickly or urgently you do so.

Agent Jones—no other officer heard the noises—testified that he heard a noise "like somebody going through a garbage can.  Either, like, a rustling of papers or plastic or something to that effect."  The officer testified that he feared "somebody might be destroying evidence."  But when asked by the government's counsel "[i]n your experience as a DEA agent" what methods were used to destroy meth, he answered, "[m]ostly through the sewer system, either being in the toilet, shower, a sink, anything like that.  Other things have been burning.  Those would be the two main ones that would come to mind."  What is the reasonable relationship between "the rustling of papers or plastic" and "the sewer system" or "burning"?  There is no evidence—nothing—in the record to suggest that the officers thought Iwai was about to flush or burn the drugs.  Agent Jones thought Iwai might

be "going through a garbage can." But evidence isn't destroyed when you dump it in a trash can. And if he dumped it in the trash, where could he possibly have gone with the garbage bag when he lived on the 23rd floor? Not to a garbage chute in the hall or to a dumpster downstairs—there were seven armed task force officers standing between Iwai and any trash receptacle. And if Iwai could have tossed it from a window, there were officers outside watching the perimeter.

These five factors, considered together, are insufficient to establish exigency justifying battering down Iwai's door. True, the officers knew there was meth in the apartment, believed the package had been opened, and saw Iwai through the peephole. But police nearly always know that drugs are inside before they send a fully armed tactical team to bang on someone's door, and if a controlled delivery, they will likely always wait until the beeper goes off. Iwai had every right not to not open the door, and the fact he calmly walked away from it hardly supports exigency. The only distinguishing factor—the "rustling" of paper and plastic—was not sufficient to justify storming Iwai's apartment. The record simply doesn't withstand scrutiny.

2

I have two last points on the officers' claim of exigent circumstances. First, I recognize that I have atomized the facts, and that the officers were entitled to consider the totality of the circumstances: I have thus previously confessed that this issue is closer for me than the failure to obtain a warrant. However, even taking all of these facts together, they don't amount to very much. The agents knew there were drugs in Iwai's apartment (this was obvious, because they had conducted the controlled delivery of a package they had reboxed); they believed the beeper had

alerted, indicating the package had been opened (it hadn't, but that wasn't the officers' fault); Iwai refused to open the door in response to their demands (he was privileged to do so); he was moving about his apartment (what do we think people do in their apartments?); and they heard "rustling" noises (something, but not a noise typically associated with destroying drugs). Considered together, I can't conclude that the officers were excused by the exigencies of the situation from obtaining a warrant to preserve the evidence.

And this brings me to my second point. Even if we consider the totality of the circumstances known to the officers at the time, what was the exigency? To preserve evidence of a crime? The officers knew of only *one gram* of meth in the apartment. The task force knew this because the officers had packed the box themselves; they knew what was originally in the box, and they knew what was now in the box. The real evidence was left at headquarters. They also knew that Iwai had retrieved the package and carried it upstairs to his apartment. The officers had stalked Iwai every step of the way, so what was the urgency to establish Iwai's connection to the meth?

We have said that "[e]xigent circumstances are those in which a *substantial risk . . .* to the law enforcement process would arise if the police were to delay a search [ ] until a warrant could be obtained." *Reid*, 226 F.3d at 1027–28 (emphasis added) (quoting *United States v. Gooch*, 6 F.3d 673, 679 (9th Cir. 1993)); *see United States v. Lawson*, 499 F. App'x 711, 712 (9th Cir. 2012) ("No facts indicated that essential evidence would imminently be destroyed. Most of the drugs that had been in the box had been removed by police and replaced with sham substances before the box was delivered."). The government has not shown that the possible loss of one gram of meth out of six pounds "ma[de]

the needs of law enforcement so compelling that the warrantless search [was] objectively reasonable." *Struckman*, 603 F.3d at 743. To assert otherwise stretches reason. "[I]n the absence of any 'immediate and *serious consequences*' resulting from the commission of a crime, the 'overriding respect for the sanctity of the home that has been embedded in our traditions since the origins of the Republic,' militates against warrantless entry." *Id.* at 746 (emphasis added) (first quoting *McDonald v. United States*, 335 U.S. 451, 460 (1948) (Jackson, J., concurring), then quoting *Payton v. New York*, 445 U.S. 573, 601 (1980)). The government did not meet its "heavy burden" to "justif[y] a departure from the normal procedure of obtaining a warrant." *Driver*, 776 F.2d at 810.

For me, the facts supporting the finding of exigency just don't add up.

### B

Finally, even if there was an exigency in this case, "[e]xigent circumstances created by improper conduct by the police may not be used to justify a warrantless search." *Ojeda*, 276 F.3d at 488. In *Kentucky v. King*, the Supreme Court addressed the question of when police, because of their own conduct, may not rely on the exigent circumstances doctrine. The Court's short answer: where police "create the exigency by engaging or threatening to engage in conduct that violates the Fourth Amendment." 563 U.S. at 462.

The Supreme Court in *King* was particularly focused on the knock and announce procedure. The Court made quite clear that officers who knock on a door and announce their presence do not "cause" the exigent circumstances, even if the residents—now alerted to police presence—respond by

attempting to destroy incriminating evidence. These persons "have only themselves to blame for the warrantless exigent-circumstances search that may ensue." *Id.* at 470. This is because "[w]hen law enforcement officers who are not armed with a warrant knock on a door, they do no more than any private citizen might do," even if they had to "knock on the door with some force" and "announce their presence loudly." *Id.* at 468–69. There are good reasons for officers to knock and announce, such as to "obviate the need to apply for and execute a warrant" or to seek consent to search, or to obtain additional evidence before applying for a warrant. *Id.* at 466–67.

So "[u]nder what circumstances do police impermissibly create an exigency?" *Id*. at 471. The Court declined to answer this question with specifics, but it offered some general guidelines: when "the officers either violated the Fourth Amendment or threatened to do so prior to the point when they entered the apartment." *Id.* The Court suggested by way of example that police would act improperly if they "demanded" that the resident open the door or if they threatened the resident "by announcing that they would break down the door if the occupants did not open the door voluntarily." *Id.* at 471–72.

In the wake of *King*, we and other courts have struggled to define the contours of an appropriate knock and announce. In *United States v. Perea Rey*, we held that "it remains permissible for officers to approach a home to contact the inhabitants," but that "[t]he constitutionality of such entries . . . hinges on whether the officer's *actions* are consistent with an attempt to initiate consensual contact with the occupants of the home." 680 F.3d 1179, 1187–88 (9th Cir. 2012) (emphasis added). When considering those actions, we explained in *United States v. Lundin* that "if the police do

not have a warrant they may 'approach the home by the front path, knock promptly, wait briefly to be received, and then (absent invitation to linger longer) leave.'" 817 F.3d at 1159 (quoting *Florida v. Jardines*, 569 U.S. 1, 8 (2013)). The Second Circuit, applying *King*, elaborated further: "Although law enforcement officers, like any other citizens, have an implied license to approach a home, knock on the door, and try to speak with the occupants," this license "is limited . . . to a specific purpose." *United States v. Allen*, 813 F.3d 76, 85 (2d Cir. 2016) (quoting *Jardines*, 569 U.S. at 8). And this purpose "generally does not include conducting a warrantless search" *id.*; instead, the police have the right to knock on someone's door "for the purpose of asking questions of the occupants." *Lundin*, 817 F.3d at 1158 (quoting *Perea-Rey*, 680 F.3d at 1187).

In my view, the task force's knock and announce went well beyond the conduct that "any private citizen might do." *King*, 563 U.S. at 469. Private citizens do not bring seven armed people in full battle regalia, with weapons drawn and a ballistic shield and a battering ram, to knock on the neighbor's door for a "consensual" conversation.[3] At no time did the officers ask Iwai to open the door so they could talk with him. They did not "knock promptly" and "wait briefly to be received." To the contrary, Agent Jones testified candidly that he repeatedly "yelled out 'Police,' in a loud manner and told the occupants to open the door." He then kicked the door while "announc[ing], 'Police. Open the door.'" Once he looked through the peephole, he began calling "'Bryant, I can see you through the peephole. Open

---

[3] Agent Jones conceded that their equipment was that "commonly used for entry purposes *during search warrants*."

the door.'"**[4]**  The demand to open the door, accompanied by an armed team with a ram, is almost precisely the scenario the Court hypothesized in *King*: a demand for entry accompanied by an "announce[ment] that they would break down the door if the occupants did not open the door voluntarily."  *Id.* at 471; *see United States v. Spotted Elk*, 548 F.3d 641, 655 (8th Cir. 2008) ("[A] police attempt to 'knock and talk' can become coercive if the police assert their authority, refuse to leave, or otherwise make the people inside feel they cannot refuse to open up . . . .").

"[O]nce an attempt to initiate a consensual encounter with the occupants of a home fails, 'the officers should end the knock and talk and change their strategy by retreating cautiously, seeking a search warrant, or conducting further surveillance.'"  *Perea-Rey*, 680 F.3d at 1188 (citing *United States v. Troop*, 514 F.3d 405, 410 (5th Cir. 2008)); *see King*, 563 U.S. at 469–70 ("[An] occupant has no obligation to open the door or to speak.").  Thus, when Iwai did not open the door, "the consensual encounter . . . fail[ed]," and the officers were required to leave promptly and "change their strategy."  *Perea-Rey*, 680 F.3d at 1188; *see Andino*, 768 F.3d at 101 n.7 ("[A]s a general matter, once a resident refuses to consent to a search, officers must leave the property shortly thereafter.") (citing *Jardines*, 569 U.S. at 7–10).

The officers had no intention of leaving the property "absent invitation to linger longer."  The lead agent testified that once Iwai did not respond to his demand to open the door, Iwai would have been treated "as a barricaded subject"

---

**[4]** The officer also testified that, notwithstanding the drawn weapons, ballistics, shield, and battering ram, they "did [not] intend to enter the unit."  The facts speak for themselves.

and they would have "held the location until [they] got a search warrant to be able to go in and get him."  In other words, not only did the officers treat the warrant as the *last* resort instead of the first, but not one of the options under consideration involved anything other than arresting Iwai in his apartment. *See Linicomn v. Hill*, 902 F.3d 529, 536 (5th Cir. 2018) ("In assessing whether the officers created the exigency, we focus on the 'reasonableness of [their] investigative tactics leading up to the warrantless entry.'") (citation omitted).  Any alleged exigency was one of the officers' making.

## IV

This case is very troubling.  But as the Second Circuit observed, "[a]ny problems in effecting the arrest were . . . the result of [the officers'] decision to forgo seeking a warrant, and instead go to [the defendant's] home with the pre-formed plan to arrest him without a warrant." *Allen*, 813 F.3d at 87 (internal quotation marks and alterations omitted).  These problems were easily solved by obtaining a warrant.

I respectfully dissent.